### The People *against* Robert M. Goodwin.

THE prisoner was indicted and tried at the Court of General Sessions of the Peace, held in and for the City and

ALBANY, August, 1820.

THE PEOPLE v. GOODWIN.

In cases of *felony*, as well as of *misdemea-nour*, if the jury, after deliberating so

long on the prisoner's case, as to preclude a reasonable expectation that they will agree on a verdict, unless compelled to do so by famine or exhaustion, they may be discharged, and the prisoner be again tried by another jury.

As where on an indictment for *manslaughter*, the jury, after a trial of five days, and after being kept together to consider of the verdict for *seventeen* hours, declared that there was no probability of their agreeing on a verdict, and it being within half an hour of the time when the Court was bound by law to close its session, the jury were discharged, and the prisoner again tried at another Court.

The Court of *General Sessions of the Peace* of the City and County of *New-York*, having by statute. (2 *N. R. L.* 503. sess. 36. ch. 85. s. 9.) all the powers of a Court of *Oyer and Terminer and Gaol Delivery*, and to try for all crimes, (cases affecting life only excepted,) and to determine and adjudge the same, it possesses also, as an incident of the power to try, the right of discharging the jury, under circumstances in which a Court of Oyer and Terminer might do so. Whether, since the statute, it has also the power of granting a new trial on the merits, *Quere*.

Where a prisoner tried at the Court of *Sessions*, is brought before this Court, on *Habeas Corpus* and *certiorari*, and a second trial is ordered, the trial may be before a Court of *Oyer* and *Terminer* and *Gaol Delivery*, or at the next *sittings* in *New-York* or *Albany*, under the act, 1 *N. R. L.* 335. sess. 36. ch. 66. s. 1. 5.

County of *New-York*, in *March* last, for manslaughter, in killing *James Stoughton*, Esq. on the 8th of *January* last. The trial lasted five days. The jury having retired to consider of their verdict, at two o'clock in the morning of the fifth day, remained until six o'clock in the afternoon of the same day (*Saturday*) when they came into court, and being asked as to their verdict, answered, by their foreman, that they found the prisoner *guilty*, but begged leave to recommend him to the mercy of the Court. Before the verdict was recorded, the counsel prayed that the jury might be *polled;* and on being polled accordingly, the *third* juror answered, not guilty. The jury were then sent out to reconsider of their verdict. At half past 11 P. M. and within half an hour of the legal termination of the sessions, the Court sent to know whether the jury were agreed, and being informed that they had not agreed, they were sent for and returned into court. On being asked by the presiding judge, whether they would be able to agree within half an hour, being the latest period to which the Court could sit, according to law, the jurors answered, that " there was not the least possibility of their agreeing ;" and the jury were thereupon discharged by the Court. The Court below having refused to bail the prisoner, he was brought before the *Chief Justice*, on the 3d of *April* last, who, after hearing counsel, admitted him to bail.

The defendant, pursuant to his recognizance, appeared at the last *May* term.

*Van Wyck*, District Attorney, stated, that the only question was, whether the prisoner was to be again put upon his trial on the indictment.

*Hoffman*, for the prisoner, then moved for his discharge, on the ground that having been once tried, he could not legally be put on his trial a second time. There were cases of physical necessity, he admitted, where sickness, insanity, or other cause, rendered it impossible to proceed in the ordinary course, where the jury had been discharged, and the prisoner again tried ; but *no instance could be found of a second trial in a case of this nature.* In all the cases where

the jury has been discharged, it has been in favour of life, or liberty, for the benefit of the prisoner, and on his motion.

In the case of the *People* v. *Denton*, (2 *Johns. Cases*, 275.) the Court say, " the power of discharging a jury *in cases of misdemeanours*, as in civil cases, rests in sound discretion, and is to be exercised with great caution. In the case of the *People* v. *Olcott*, (2 *Johns. Cases*, 301.) Mr. Justice *Kent*, who delivered the opinion of the Court, after noticing the learned argument of Sir *Michael Foster*, in the case of the *Kinlocks*, (*Foster*, 22—40.) gives instances in which the rule, that the prisoner, where the jury are discharged, cannot be remanded for another trial, has been made to give way to necessity ; but they are of the same character, or where the prisoner has either consented to their discharge, or it was for his benefit; as where he becomes sick or insane, or one of the jurors is taken sick or goes off. He observes, that most of the cases on this subject relate to trials for capital offences; but the case then before the Court was that of a *misdemeanour* only, in which the power of the Court was analogous to its power in-*civil* cases. In the case of the *Kinlocks*, natives of *Scotland*, who were arraigned befor the special commission for trying the rebels of 1745, after the jury were sworn, doubts were entertained whether the prisoners might not avail themselves of a clause in the act of union, entitling them, as they supposed, to a trial in *Scotland*, and whether they could have the benefit of such defence, under the plea of the general issue. And upon their own motion, a juror was withdrawn, in order to let them in to plead the act specially. Though this was upon their own application, and for their benefit, it became a serious question, whether the consent of the prisoner would avail the prosecutor, or prevent the application of the general rule. Nine out of the ten judges who delivered their opinions on the question, it is true, agreed that it was not a case in which the general rule was binding. The cases of the *King* v. *Stevenson*, and of the *King* v. *Salbert*, (2 *Leach's Cases*, 618. 706.) were cases of necessity, where a juror, during the trial, was taken suddenly ill, and the jury were discharged, and the prisoners tried by another jury. These

being cases of necessity, it is admitted, that they form exceptions to the general rule.

If the power of granting a new trial in cases of *felony*, where the prisoner has once been tried, does belong to any Court, the exercise of it could not be safely entrusted to a Court of Sessions. In cases of *misdemeanours*, the party can have a *certiorari;* but in cases of *felony*, it rests in the discretion of the judges to allow or refuse it. A Court of *Sessions* has no power to grant new trials.

Again, the *fifth* article of the *amendments* to the Constitution of the United States, declares, that " no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, &c. *Nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb ;"*—The words " jeopardy of limb," must mean deprivation of liberty, for *dismemberment* could not have been contemplated, since such a punishment did not exist for ages before, at the common law, except the loss of a hand for striking in the King's Courts. And the following clause : " nor be deprived of life, liberty, or property, without *due process* of law," shows that those words mean loss of liberty, as there was no process of law for depriving a person of a limb. So *Coke*, (2 *Inst.* 42.) understands the words in the Great Charter of Hen. III. " *Qui inquisitionem petit de vita* vel *membris ;"* as the writ *de odio* et *atia*, given to a man, who was *imprisoned*, though for the most odious cause. This provision of the Constitution of the United States could never have been intended to be restricted to the Courts of the United States, but was meant for the protection of every citizen of the United States in all courts and places. The *sixth* amendment shows the same solicitude to secure the right of the citizen ; and these articles, as the Constitution itself, are to be regarded as the paramount law of the land. If putting a person on his *trial*, was not putting him in *jeopardy* of limb, or *imprisonment*, would not the language have been, that no man should be twice *tried* for the same offence ? The obvious meaning is, that he shall not be exposed to the *danger* of repeated attacks and experiments, on the part of the public prosecutor, under which the most innocent must, at last,

succumb. The word *jeopardy*, in its *legal*, as well as in its etymological or grammatical sense, means danger or hazard.

*Griffin* and *Wells*, contra, admitted, that it was a great and very important principle of the common law, that the accused could not be twice put in jeopardy for the same offence. But this principle is to have a reasonable application: It does not mean that the accused shall not be put a second time at the bar of the Court. The true and just sense of the maxim is, that having been once fully and fairly tried on the merits, and a verdict found in his favour, he shall not be tried again, but the verdict shall shield him from a second exposure to punishment. The argument on the other side, rests on the authority of Lord *Coke ;* yet his doctrine, as has been shown by Sir *Michael Foster*, is not supported by the authorities which he cites ; and it might be sufficient to refer to the case of the *Kinlocks*, *(Foster*, 23.) to establish the conclusion, that a jury may be discharged, with, or without the consent of the prisoner, in a criminal case of any description, and the prisoner be again tried. So that the rule is clearly not so unqualified and inflexible as has been supposed on the authority of my Lord *Coke.* But, it is conceded by the counsel, that these are exceptions to the rule, and that is enough for our argument. Sir *Michael Foster* very justly observes, " that all general rules touching the administration of justice, must be so understood, as to be made consistent with the fundamental principles of justice ; and, consequently, all cases where a strict adherence to the rule would clash with those fundamental principles are to be considered as so many exceptions to it." But these exceptions are cases of necessity ; (4 *Bl. Com.* 360.) the object of the rule being to prevent juries from being discharged, from motives of vengeance, oppression, or caprice ; or merely to give the public prosecutor chance to repair his own mistakes, at his own convenience. Such instances of persecution or oppression may, in bad times, have stained the records of *English* jurisprudence ; but they are no longer of any weight or authority. And the rule, with the exceptions, for which we contend, is not only

the established law of *England,* but has been reviewed and adopted in our own courts. (*Keyl,* 25, 26. *Comb.* 401. *Elizabeth Meadow's Case, Foster,* 76. *T. Raym.* 84. *People v. Denton, People v. Olcott,* 2₂ *Johns. Cases,* 275. 301. *People* v. *Barrett & Ward,* 1 *Johns. Rep.* 66. *People* v. *Casborus,* 13 *Johns. Rep.* 351. 2 *Hale P. C.* 295. 1 *Chitty C. L.* 634. *Rex* v. *Edwards,* 3 *Campb. N. P.* 207. *S. C.* 4 *Taunt. Rep.* 309. *United States* v. *Coolidge* 2 *Gallis. Rep.* 364.) In *Rex* v. *Edwards,* the prisoner was indicted for maliciously shooting at *L. R.* with intent to kill him. During the trial, one of the jurors was taken in a fit, and the jury were discharged, and a new jury sworn; and the prisoner was convicted. The counsel for the prisoner in that case, contended that after the evidence was gone through, the jury could not be discharged; and if from any circumstance happening at the trial, it becomes impossible for the jury to find a verdict of guilty, it was a sort of *God send* for the prisoner: but *eleven* of the twelve judges before whom the question was argued, without hearing the other side, were unanimously of opinion, that the conviction was right; that it had been decided in so many cases, that it was now settled law, and gave judgment against the prisoner. But it is said, that it is only in cases of *misdemeanours,* not in cases of *felony,* that the party may be tried a second time. Why such a distinction, if the reason is, that it is necessary to the administration of justice? *Hale* (2 *Hale P. C.* 295, 296.) makes no such distinction; and in the *Doctor* and *Student,* (*Dial.* 2. ch. 52.) it is laid down, that " the justices may set such order in the matter as shall seem to them by their discretion, to stand with reason and conscience, by awarding a new inquest." In the case of *U. S.* v. *Coolidge,* Mr. Justice *Story* would not allow of any such distinction. He said, that in *misdemeanours,* there was a larger discretion, and though before the time of *Foster,* it was supposed, that in *capital* cases, the jury could not be discharged, yet it was now settled that the discretion exists in all cases; but is to be exercised only in very extraordinary and special circumstances. So, in the *Commonwealth* v. *Bowden,* (9 *Mass. Rep.* 494.) the prisoner was indicted for highway robbery, and the jury, after being out a day and a night, said that

there was no probability that they could ever agree on a verdict, and were discharged, without the prisoner's consent, and he was, afterwards, tried and convicted by another jury : the supreme court of *Massachusetts* unanimously decided that the conviction was good; observing that the ancient strictness of the law on this subject was much abated in *England* ; and that it was inconsistent with the genius of our government to compel jurors to agree : And though the case of the *People* v. *Olcott*, was that of a misdemeanour, yet the whole reasoning of Mr. Justice *Kent* is to the same effect, and shows that had it been a case of *felony*, his opinion would have been the same. (2 *Day's Rep.* 504.)   Nor is the argument drawn from the *Sessions* of *New-York*, being an *inferior Court*, entitled to any weight. That Court, by statute, (2 *N. R. L.* 503.) is invested with all the powers of a Court of *Oyer and Terminer* and *Gaol Delivery*, excepting as to capital cases.   Being then empowered to try such offences, that power must be according to the same rules which govern the highest Court.   It must act precisely as a *Court of Oyer and Terminer* and *Gaol Delivery* would act, if the case was to be tried in those Courts. The *Court of Sessions* in *New-York*, is to be considered a Court of *Oyer and Terminer*, for every purpose, in execution of the powers thus given to it by statute.   If a verdict of *acquittal* upon an indictment, materially defective, will not afford a good plea in bar to a second trial for the same offence, surely there is much less reason why the prisoner should be discharged under the circumstances of the present case.

As to the objection drawn from the *fifth* article of amendments to the Constitution of the *United States*, it is wholly inapplicable to the State Courts: it could not be intended thus to limit the State Courts and State sovereignties. The amendment grew out of the natural jealousy existing in the states, of the powers of the general government; and were intended to provide for offences under the laws and constitution of the *United States*.   It was for the purpose of abridging the powers of the *United States*, and to secure and uphold the jurisdiction and sovereignty of the individual states.   And the legislature of this state might now pass a law, if it were

expedient, that parties should be tried on a second indict-ment, though the first may have been good. But admitting that the amendment was applicable to the state courts, the terms of it do not apply here, for the defendant, if sent to another jury, will not be put twice in *jeopardy*, nor *twice tried*; for there never has been a trial in which the merits of the case have been decided upon. If merely being put on trial, and the jury are discharged, because they cannot agree, is sufficient to prevent a second trial, what becomes of all the exceptions to the general rule which, it has been conce-ded, do exist? What then becomes of the doctrine derived from the amendment to the Constitution of the *United States*, which contains no exceptions, nor any provisions for those casualties which necessarily create them?

*T. A. Emmet*, in reply, contended, that a case like the pre-sent had never been decided in this Court, nor in any of the higher courts of any of the *United States*, except one, (9 *Mass. Rep.* 494.) where it was decided erroneously, and without ad-verting to, or understanding the provision of the Constitution of the *United States*, on the subject. *Lord Coke*, (3 *Inst.* 110.) from the manner of his expression, evidently considered it to be a *fundamental rule* of the common law, when he says, "To speak it here, once for all, if any person be indicted of *trea-son*, or of *felony*, or *larceny*, and plead not guilty, and there-upon a jury is returned and sworn, their verdict must be heard, and they cannot be discharged, neither can the ju-rors in those cases give a privy verdict, but ought to give their verdict openly in Court." In 1 *Inst.* 227. *b.* the words, though different, have the same meaning: "A jury," he observes, "sworn and charged in case of life or member, cannot be discharged by the Court or any other, but they ought to give a verdict." What Sir T. *Raymond* (84.) says of *Ferrar's* case, shows that such was the opinion prevailing among the learned in the law. (*Hale's Summary, P. C.* 267.) The rule is also laid down by *Carthew*, (465.) and is adopted by *Hawk*, (*P. C. B.* 2. c. 47. s. 1.) and with a slight restriction, by *Blackstone* (*Comm.* 354. 3 *Bac. Abr.* 768. *Juries*, G.) *Carthew* says, that the rule was stated by *Holt*, Ch. J. in the case of the *King* v. *Perkins*, to have been so

decided by all the judges of *England*, upon debate before them. It is true, the judges and the counsel for the crown in *Kinlock's* case doubted, and asserted that, " except the resolution reported by *Carthew*, there is not a single authority in the books, that a juror may not be withdrawn, or the jury discharged, even in capital cases, with the consent of all parties." Now, we find in the report of the case of the *King* v. *Perkins*, 1698, (*Rep. temp. Holt*, 403,) that it is there stated as having been so resolved by all the judges. *Carthew*, therefore, is not only supported by this authority, but also by a MS. note of the same resolution by Mr. Justice *Tracy*, referred to by Mr. *Jodrell*, the counsel for the prisoners in *Kinlock's* case. These three concurrent reports of that resolution are very feebly opposed by the MS. report of the case of the *King* v. *Perkins*, by Chief Justice *Eyre*. The opinion expressed by *Kent*, J. in *Olcott's* case, is extra judicial; but the judges in *Kinlock's* case did no more than to controvert the *absolute universality* of the rule laid down by Lord *Coke*, and to state exceptions; and none of the exceptions, whether right or wrong, bear any analogy to the present case. (Here the counsel examined the several cases. *Mansell's Case*, 1 *And.* 103, 104. *Roberts' Case*, *Kely.* 25, 26. *Whitbread's Case* and *Fenwick's Case*, 2 *St. Tr.* 827, 828. *King* v. *Jane D.* 1 *Vent.* 69. 2 *Hale H. P. C.* 295. *et vide Emlyn's Note.*)

Although there certainly has been a tendency, by the unceasing operation of exceptions, to undermine the general rule laid down by Lord *Coke*, yet the later *English* cases have not extended the exceptions beyond actual physical necessity. *Eliza Meadow's Case*, (*Foster*, 76.) *Rex* v. *Scalbert*, (2 *Leach*, 706.) and *Rex* v. *Edwards*, (3 *Camp. N. P.* 207. *S. C.* 4 *Taunt.* 309.) were all cases of extreme necessity. The cases in our own courts, as well the case of the *State* v. *Woodruff*, (2 *Day's Rep.* 504.) are those of *misdemeanours*, with which we have nothing to do in this cause. The case of the *People* v. *Casborus*, (13 *Johns. Rep.* 351.) it is true, was a case of *felony*, but it was decided on the same principle as the case of the *People* v. *Barrett & Ward*, (1 *Johns. Rep.* 66.) that as the first indictment was bad, so that the judgment must have been arrested, the prisoner

was never put in *jeopardy.* In the Court of *General Ses-sions* of the city of *New-York*, there have been, indeed, cases of felony where the jury has been discharged; and the case of *Hawxhurst*, (2 *City-Hall Recorder*, 33. 1817.) indicted for *Grand Larceny*, where the trial ended at 2 o'clock, and the jury not having agreed on a verdict, by 8 o'clock the same evening, were discharged, shows how far an inferior court, which cannot grant a new trial, will go in the exercise of this assumed discretionary power over juries. *United States* v. *Coolidge*, (2 *Gallis.* 364.) was that of a misdemeanour; and though Mr. Justice *Story* held that the Court had a discretion to discharge a jury, even in a capital case, he said it was to be exercised only in " very extraordinary and striking circumstances :" and he very properly, in that case, did not discharge the jury, but suspended the trial; and the indictment was afterwards quashed on motion, as improperly found. The case of *Bowden*, (9 *Mass. Rep.* 494.) is, in truth, a case directly against the doctrine for which we contend; but it is the only one, and having been decided on the authority of modern *English* cases, without any reference to the provisions of the Constitution of the *United States*, must be regarded as erroneous; for since the amendment to the Constitution, no *American* court of justice is at liberty to adhere to *English* decisions on this subject, if they are found to be opposed to this provision of the Constitution.

The fifth article of amendments to the Constitution of the *United States*, has been misunderstood by the respectable Judge (the Mayor) who presided in the Sessions, in *Hawxhurst's* case, and in the present case. He supposed, that the words " life and limb," related to the burning in the hand, a punishment which had been abolished. What then is the true meaning of the words " *in jeopardy* of life or limb?" In no state of the Union was there any punishment of limb applicable to a freeman, to guard against which, it could have been thought necessary to introduce that expression. We find the same expression in the *Bill of Rights* of this State, (1 *N. R. L.* 47. sess. 10. ch. 1.) which declares, that " no person shall be put out of his or

her franchise or freehold, or lose his or her life or limb, or goods or chattels, unless he or she shall be duly brought to answer, and be forejudged of the same, by due course of law." There never was, in this state, any law by which a person could be forejudged of loss of limb; yet this expression must have some meaning, or it would not have been used. It was copied into the bill of rights from an ancient *English* statute, and was, no doubt, introduced into the Constitution of the *United States* from the same source. It should have, therefore, the same acceptation as in the original statute from which it was derived. It is one of the oldest expressions known in the law, derived from the ancient punishment of felonies, and has acquired a technical meaning which has been preserved since the abolition of the punishment. It means treason, and *every felony, whether clergyable' or not, exceeding petty larceny*, though the punishment of it should not affect life or limb. Before the *Norman* conquest, most, if not all felonies, were punishable with death, redeemable, however, with the *weregild*. (1 *Hal. Hist. P. C.* 12. note.) In the time of *William* I., and *William* II., most felonies were punished by loss of limb; but in *Henry* I. 9. (A. D. 1103.) it was ordained by parliament, that the judgment for all manner of felonies should be, that the person attainted should be hanged by the neck, which continueth to this day." (3 *Inst.* 53.) From that time, though there was no punishment of loss of limb, yet the phrase continued to be used as expressing treason, or felony above the degree of petty larceny. *Hale* (*H. P. C.* 70. 73. ch. 65. s. 1.) says, " generally, if an act of parliament be, that if a man commit such an act, he shall have judgment of life and member, this makes the offence felony, and this was ordinarily the clause used in ancient statutes, as *Westm.* 2. c. 34. 14 *Edw.* III. c. 10. 28 *Edw.* III. c. 3. 13 *Rich.* II. c. 3." Here the counsel went into a minute examination of these ancient statutes, most of which are referred to, and commented on by *Coke*, in his 3 *Inst.* (p. 90. 101.) He referred, also, to 2 *Inst.* 434. 1 *Inst.* 390. *a. b.* *Bro. Abr. Corone*, pl. 204. *Hob.* 293. *Hale's H. P. C.* 641. 1 *Hawk. P. C.* 305. B. 1. c. 40. s. 2. in further confirmation of his position, that where a statute

enacted a judgment of life or limb for any offence, it con-
stituted such offence a *felony*, whether that word was used
or not.    The words, he said, also relate to *clergyable felo-
nies*, (2 *Hale's P. C.* 330. 333. 325, 326. 373.) as well as
those not clergyable, and had no reference to burning in
the hand, used in clergyable offences, which was abolished
in *Hen.* VII. c. 13. more than 200 years after the phrase had
acquired a precise meaning in the law.    Besides, burning
in the hand was no part of the punishment, but merely to
prevent the benefit of clergy a second time.    (5 *Co.* 50. *a.
b. Hob.* 294.)    Nor does the phrase relate to cropping
the ears, or loss of hands.    The loss of hands was a punish-
ment for striking in a superior Court of Justice, which was
never considered a *felony*, at least, since the *Norman* con-
quest ; and it being an aggravated contempt in the face of the
Court, it was punishable without the intervention of a jury.
Besides, the punishments of cropping, and loss of limbs,
were enacted by comparatively modern statutes, as 5 and 6
*Edw.* VI. 33 *Hen.* VIII. and 8 *Eliz*, none of which were
applicable to this country, and could never have been con-
templated by the framers of the constitution.    These words,
then, convey a legal meaning, as definite as the word *felony*
itself.    And so Mr. Justice *Kent* understood them, in *Olcott's*
case, when commenting on the rule laid down in *Co. Litt.*
227. *b.* in cases of life and member, "and so in all cases
of felony."

Then, as to the meaning of the words, being " put in jeo-
pardy :" They cannot mean the trying a person a second time,
after one complete and effectual trial had been had ; for it re-
quired no article of the constitution to prohibit that.    This
phrase though well known in the language, and not of frequent
use, and having no precise technical signification, yet it is
often found in our law books.    (*Foster*, 37.)    It signifies
hazard, danger, peril.    There may be cases in which the
indictment is so radically bad, that no judgment could be
rendered on it ; or there may be some physical necessity or
casualty intervening, that would render a conviction impos-
sible ; and in such cases, it might, perhaps, be said, that
the prisoner had not been put in jeopardy.    But the pre-
sent case differs from every one that has been cited ; and,

it may be laid down as a general position, that where the judgment is good, and where the cause was committed to the jury, on evidence which would support a conviction, if they thought fit to convict, and where no necessity has occurred to prevent the delivery of the verdict, there is *jeopardy*. This article of the constitution has never been before distinctly brought into view, and it is directly applicable to the present case. Perhaps, those who suggested the amendment, foresaw the danger of a further extension of the exceptions to the general rule, and may have apprehended what *Kent*, J. in *Olcott's case*, (1 *Johns. Cases*, 308.) has since expressed, and which may have been thought an alarming doctrine. " The moment cases of necessity are admitted to form exceptions, that moment a door is opened to the discretion of the Court, to judge of that necessity, and to determine what combination of circumstances will create one." They may have intended to bring back the rule to its original simplicity and strictness; and leave it no longer to the discretion of judges to determine what combination of circumstances should create an exception. Our law, in this respect, is fixed on a firm and immoveable basis, which cannot be shaken by any *English* authorities, prior, or subsequent to the declaration of independence; and, hereafter, the only question on this subject will be, whether a person has been once put in jeopardy? It is unnecessary to consider any of the supposed cases of physical, and inevitable necessity, in consequence of which, a trial could not proceed. Nor is it requisite to inquire whether this article has a binding force on the State Courts. It creates no new rule. Its object is merely to settle the extent of, and to explain a rule admitted to be founded on the common law, but the limits of which had been disputed. It is a most authoritative interpretation of that rule. [The counsel here went into an examination of the origin and object of the amendment, and of the probable motives of the authors of it.] (1 *Laws of United States*, 72. new ed. by *Colvin*.)

The counsel next discussed the question, whether, if the Court should direct another trial, and did not think it consistent with the business of the term, to have the trial at bar, they might send it to be tried at the Court of *Oyer and*

*Terminer and Gaol Delivery,* or before the Judge who was to hold the *next sittings* in *New-York.* He observed that, as the *Circuit Court and Sittings,* and *Courts* of *Oyer and Terminer and Gaol Delivery,* usually sat without any distinct commissions, the powers of the Court to direct trials of this nature, must depend on the statutes by which they were regulated, (1 *N. R. L.* 335. sess. 36. ch. 66. s. 1. 5, 6. 15.) which he examined; and concluded, that the Court had the power and election, either to try the cause at bar, or to send it to be tried at a *Circuit* or *Sittings,* or before a Court of *Oyer and Terminer.*(a)

SPENCER, Ch. J. delivered the opinion of the Court. A motion has been made to discharge the defendant, on the ground that it appears by the return to the *certiorari,* that he has been once tried, and therefore cannot legally be tried again. He was indicted in the Sessions in *New-York* for manslaughter; the trial continued for five days, and the jury, after having received the charge of the Court, retired to consider of their verdict; were kept together 17 hours, and declaring there was no probability of their agreeing on their verdict, were discharged after 11 o'clock at night, on the last day in which the Court could sit. It appears that the jury had, in the mean time, between their receiving the charge of the Court, and their discharge, come into Court, and on being asked if they had agreed on their verdict, answered, through their foreman, that they had agreed, and that they found the prisoner guilty, but recommended him to mercy; but on being polled, the third juror called upon, declared his disagreement to the verdict. These are all the facts material to be noticed in considering the present motion.

The defendant's counsel rely, principally, on the 5th article of the amendments to the Constitution of the *United States,* which contains this provision : " *Nor shall any person be subject for the same offence, to be twice put in jeopardy*

(a) The above brief summary of the arguments of the counsel in this cause, which was most elaborately discussed, has been taken from the notes furnished to the reporter, by *William Sampson,* Esq. who has published a very full and accurate report of the trial, and of all the proceedings in this interesting case.

*of life or limb.*" It has been urged by the prisoner's counsel, that this constitutional provision operates upon state courts *proprio vigore.* This has been denied on the other side. I do not consider it material whether this provision be considered as extending to the state tribunals or not; the principle is a sound and fundamental one of the common law, that no man shall be twice put in jeopardy of life or limb for the same offence. I am, however, inclined to the opinion, that the article in question does extend to all judicial tribunals in the *United States,* whether constituted by the Congress of the *United States,* or the states individually. The provision is general in its nature, and unrestricted in its terms; and the sixth article of the constitution declares, that that constitution shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state, to the contrary notwithstanding. These general and comprehensive expressions extend the provisions of the constitution of the *United States* to every article which is not confined, by the subject matter, to the national government, and is equally applicable to the states. Be this as it may, the principle is undeniable, that no person can be twice put in jeopardy of life or limb, for the same offence.

The expression, *jeopardy of limb,* was used in reference to the nature of the offence, and not to designate the punishment for an offence; for no such punishment as loss of limb was inflicted by the laws of any of the states, at the adoption of the constitution. Punishment by deprivation of the limbs of the offender, would be abhorrent to the feelings and opinions of the enlightened age in which the constitution was adopted, and it had grown into disuse in England, for a long period antecedently. We must understand the term, " jeopardy of limb," as referring to offences which in former ages were punishable by dismemberment, and as intending to comprise the crimes denominated in the law, felonies. The crime of manslaughter is, undoubtedly, a felony; and therefore, the prisoner is entitled to the protection afforded by the article of the constitution, whether we regard it as binding upon us by its own force, or as an acknowledged axiom of the common law.

ALBANY,
August, 1820.

THE PEOPLE
v.
GOODWIN.

The question then recurs, what is the meaning of the rule that no person shall be subject, for the same offence, to be twice put in jeopardy of life or limb ? Upon the fullest consideration which I have been able to bestow on the subject, I am satisfied that it means no more than this : *that no man shall be twice tried for the same offence.* Should it be said, that we can scarcely conceive, that a maxim so universally acknowledged, and so interwoven with our institutions, should need an explicit and solemn recognition in the fundamental principles of the government of the *United States*, we have only to recur to the history of that period, and to some other of the amendments, in proof of the assertion, that there existed such a jealousy or extreme caution, on the part of the state governments, as to require an explicit avowal in that instrument, of some of the plainest and best established principles in relation to the rights of the citizens, and the rules of the common law. The first article of the amendments prohibits Congress from making any law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble and petition government for a redress of grievances ; the second secures the right of the people to bear arms ; and, indeed, without going into them minutely, nearly all the amendments to that instrument, indicate either great precaution in defining the powers of the national government, and the rights of the people and the states, or they evince a jealousy and apprehension that those fundamental rights might be impugned, so as to leave no doubt that in the article under consideration, no new principle was intended to be introduced. The test by which to decide whether a person has been once tried, is perfectly familiar to every lawyer—it can only be by a plea of *auterfois acquit*, or a plea of *auterfois convict*. The plea of a former acquittal, Judge *Blackstone* says, (4 *Com.* 335.) is grounded on this universal maxim of the common law of *England*, that no man is to be brought into jeopardy of his life more than once for the same offence ; and hence (he says) it is allowed as a consequence, that where a man is once fairly found not guilty upon an indictment, or other prosecution, before any court having competent jurisdiction

of the offence, he may plead such acquittal in bar of any subsequent accusation for the same crime. The plea of a former conviction depends on the same principle, that no man ought twice to be brought in danger for the same crime. To render the plea of a former acquittal a bar, it must be a legal acquittal, by judgment, upon a trial for substantially the same offence, and the verdict of a petit jury. (1 *Chitty's Crim. Law,* 372.) In the present case, it is not pretended that the prisoner has been acquitted, unless the discharge of the jury, without having agreed upon their verdict, and without the prisoner's consent, shall amount, in judgment of law, to an acquittal. This brings us to the question, whether the Court of Sessions could discharge the jury, under the circumstances of this case. If they could not, then I should be of the opinion, that although there could be no technical plea of *auterfois acquit,* the same matter might be moved in arrest of judgment ; and if so, I can see no objection to the discussion of the question in its present shape, on a motion to discharge the prisoner.

In the case of the *People* v. *Olcott,* (2 *Johns. Cases,* 301) all the authorities then extant upon the power of the Court to discharge a jury in criminal cases, and the consequences of such discharge, were very ably and elaborately examined by Mr. Justice *Kent;* and it would be an unpardonable waste of time to enter upon a re-examination of them. In that case, the jury, after having remained out from 8 o'clock on *Saturday* evening, until near two o'clock the next day, and having, in the mean while come into court two or three times for advice, declared there was no prospect of their agreeing in any verdict, and were discharged, without the consent of the prisoner : One of the questions was, whether the discharge of the jury entitled the defendant to be discharged, or whether he could be re-tried? After examining and commenting on all the authorities, the position of the learned judge was this : " If the court are satisfied that the jury have made long and unavailing efforts to agree, that they are so far exhausted as to be incapable of further discussion and deliberation, this becomes a case of necessity, and requires an interference." He observed, " all the authorities admit that when any

ALBANY,
August, 1820.

THE PEOPLE
v.
GOODWIN.

ALBANY,
August, 1820.
THE PEOPLE
v.
GOODWIN.

juror becomes mentally disabled, by sickness or intoxication, it is proper to discharge the jury ; and whether the mental inability be produced by sickness, fatigue or incurable prejudice, the application of the principle must be the same.'' Again, he observed, " every question of this kind must rest with the Court, under all the particular or peculiar circumstances of the case.   There is no alternative—either the Court must determine when it is requisite to discharge, or the rule must be inflexible, that after the jury are once sworn, no other jury can, in any Court, be sworn and charged in the same cause.   The moment cases of necessity are admitted to form exceptions, that moment a door is opened to the discretion of the Court to judge of that necessity, and to determine what combination of circumstances will create one.''   The learned Judge inveighs, with force and eloquence, against the monstrous doctrine of compelling a jury to unanimity, by the pains of hunger and fatigue, so that the verdict is not founded on temperate discussion, but on strength of body.   Although the case of the *People* v. *Olcott* was a case of misdemeanour, the reasoning is, in my judgment, entirely applicable to cases of felony ; and although the opinion was confined to the case under consideration, a perusal of it will show that it embraces every possible case of a trial for crimes.   The opinion was delivered in 1801, and since that time this question has come under consideration in several cases.   In the case of the *King* v. *Edwards*, (4 *Taunt. Rep.* 309.) the indictment was for a felony ; and while the prosecutor was giving his evidence, one of the jurors fell down in a fit, and he was pronounced by a physician, on oath, incapable of proceeding in his duty as a juryman on that day, whereupon the jury was discharged, and a new jury sworn, and the defendant was convicted.   The point whether the prisoner could be tried, after the discharge of the jury, without consent, was argued before all the Judges in *England*, except *Mansfield*, Chief Justice, and *Lawrence*, Justice ; all the cases were cited, and the Judges, without hearing the counsel for the crown, said, that it had been decided in so many cases, it was now the settled law of the country, and gave judgment against the prisoner.   The same course was adopted, upon nearly the

same state of facts, in *Ann Scalbert's* case; (*Leach's C. C.* 706.) and in the case of the *King* v. *Stevenson*, (*Leach's C. C.* 618.) the prisoner fell down in a fit during the trial, and the jury was discharged, and, upon his recovery, he was tried and convicted by another jury. In the case of the *United States* v. *Coolidge*, (2 *Gallis. Rep.* 364.) a witness refusing to be sworn, the trial was suspended during the imprisonment of the witness for the contempt, and Mr. Justice *Story* held, that the discretion to discharge a jury existed in all cases; but that it was to be exercised only in very extraordinary and striking circumstances. In the case of the *Commonwealth* v. *Bowden*, (9 *Mass. Rep.* 494.) upon an indictment for highway robbery, the jury, after a full hearing of the cause, being confined together during part of a day, and a whole night, returned into Court, and informed the Judge, that they had not agreed on a verdict, and it was not probable they ever could agree; whereupon, one of the jurors was withdrawn from the panel, without the defendant's consent, and the jury were discharged, and during the same term, another jury was impannelled for his trial, and he was found guilty. On a motion in arrest of judgment, the Court refused the motion, saying, that the ancient strictness of the law upon this subject had very much abated in the *English* Courts; that it would neither be consistent with the genius of our government or laws, to use compulsory means to effect an agreement among jurors; that the practice of withdrawing a juror, where there existed no prospect of a verdict, had frequently been adopted in criminal trials in that Court.

Upon full consideration, I am of opinion, that although the power of discharging a jury is a delicate, and highly important trust, yet, that it does exist in cases of extreme and absolute necessity; and that it may be exercised without operating as an acquittal of the defendant; that it extends as well to felonies as misdemeanours; and that it exists, and may discreetly be exercised in cases where the jury, from the length of time they have been considering a cause, and their inability to agree, may be fairly presumed as never likely to agree, unless compelled so to do from the pressing calls of famine or bodily exhaustion. And, in the present

case, considering the great length of time the jury had been out, that the period for which the Court could legally sit, was nearly terminated, and that it was morally certain the jury could not agree before the Court must adjourn, I think the exercise of the power was discreet and legal.

Much stress has been placed on the fact, that the defendant was in jeopardy during the time the jury were deliberating. It is true, that his situation was critical, and there was, as regards him, danger, that the jury might agree on a verdict of guilty; but, in a legal sense, he was not in jeopardy, so that it would exonerate him from another trial. He has not been tried for the offence imputed to him; to render the trial complete and perfect, there should have been a verdict, either for or against him. A literal observance of the constitutional provision would extend to and embrace those cases where, by the visitation of God, one of the jurors should either die, or become utterly unable to proceed in the trial. It would extend, also, to a case where the defendant himself should be seized with a fit, and become incapable of attending to his defence; and it would extend to a case where the jury were necessarily discharged in consequence of the termination of the powers of the Court. In a legal sense, therefore, a defendant is not once put in jeopardy, until the verdict of the jury is rendered for, or against him; and if for or against him, he can never be drawn in question again for the same offence. I entirely concur in reprobating the proceeding of withdrawing a juror, and attempting to subject a person to a second trial, because the public prosecutor was not prepared with his proofs. In the case of the *People* v. *Barrett & Ward*, (2 *Caines' Rep.* 304.) this Court considered it equivalent to an acquittal.

The only remaining inquiry is, whether the power of discharging the jury in this case could be exercised by the Sessions?

The Court of General Sessions for the city of *New-York*, is clothed with powers not entrusted to the General Sessions of any other county. It has power to try for all crimes, (cases affecting life only excepted,) in as full and complete a manner as any Court of Oyer and Terminer and Gaol Delivery, for the said city and county, and can hear,

determine, and adjudge the same. (2 *N. R. L.* 530.) It is not necessary now to decide whether the Sessions in *New-York*, since the statute, can grant a new trial on the merits ; but having as full and perfect jurisdiction as the Oyer and Terminer, and Gaol Delivery, excepting in cases of life, over all other cases, no doubt can be entertained that they possess all the incidents appertaining to the power of trying for these offences ; and the right to discharge the jury, under the facts and circumstances of this case, was an incident to the trial. Upon the whole, I am of opinion, that whenever, in cases of felony, a jury has deliberated so long upon a prisoner's case as to preclude all reasonable expectation that they will agree on a verdict, without being compelled to do so from famine or exhaustion, then it becomes a case of necessity, and they may be discharged, and the prisoner may be again tried. In the present case, we consider the discharge of the jury as a discreet exercise of the powers of that Court, either on the ground that the jury had been kept together so long as to preclude all hope of their agreeing, unless compelled by famine or exhaustion, or on the ground that the powers of the Court were to terminate within a few minutes, and that it was morally certain that the jury could not agree within that period, which produced an absolute necessity for discharging them.

In this opinion my brethren entirely concur, and the consequence is, that *Goodwin* must be tried at the next Sittings, and his recognizance, and that of his sureties, will be respited until the next *January* term.

Motion to discharge denied.