Thurman, C. J.
We are of opinion that a forgery of an indorsement of a promissory note is within the meaning of the 22d *234 section of the crimes act. Swan’s Stat. (new ed.) 272’. True, the words “ indorsement of a promissory note ” are not in the section ; but it does provide against the forgery of any “bill of exchange,” or “ contract,” “ for the payment of money or other property,” or . “ any order, or any warrant, or request, for the payment of money, or the delivery of goods and chattels of any kind,” or “ any transfer or assurance of money, stock, goods, chattels, or other property whatever,” or “ any power to receive money.”
In Aymar v. Shelden, 10 Wend. 439, the court said : “No principle seems more fully settled or better understood in commercial law than that the contract of the indorser is a new and indejmndent contract, and that the extent of his obligation is determined by it. The transfer by indorsement is equivalent in effect to the drawing of a bill, the indorser being in almost every respect as a new drawer.” Lord Ellenborough, in Ballingalls v. Gloster, 3 East, 481, and Lord Mansfield, in Heylin v. Adamson, 2 Burr. 674, said, expressly, that, as between indorser and indorsee, “ every indorsement is a new bill.” To the same effect are Slocum v. Pomeroy, 6 Cranch, 221, and Story’s Conflict of Laws, 261. These 234] *authorities were considered and fully approved in Case v. Heffner, 10 Ohio, 180.
With these decisions before us it would, possibly, be admissible to say that an indorsement of a promissory note is embraced by the term “ bill of exchange ” in the forgery act. But if this be thought too largo a construction to give to a criminal statute, it can hardly be gainsaid that such an indorsement is a “ contract for the payment of money.” It is none the less a contract that the liability is contingent. There is nothing in the statute that warrants the argument of counsel that the word “ contract ” is limited to unconditional promises.
It may also be considered “ an order for the payment of money,” and'surely the sentence “any transfer or assurance of money, stocks, goods, chattels, or other property whatever,” is comprehensive enough to include it.
The point that the indictment is defective because it does not employ the precise words of the statute, is countenanced by highly respectable authorities, but there is perhaps an equal weight of authority against it, and it is certainly opposed to the current of Ohio decisions. Sutliffe v. The State, 18 Ohio, 469; Sharp v. The State, 19 Ohio, 379. All the elements necessary to constitute the *235 crime must be averred; in other words, the case must be clearly brought within the statute. To do this it is generally necessary to use the words of the statute. There is great danger in employing what are supposed to be convertible terms. Nevertheless, the precise words are not always indispensable. The’rule was thus stated by Judge Hitchcock in Lougee v. The State, 11 Ohio, 69 : “ The offense itself should be set forth with clearness and certainty ; and must be so described as to bring it substantially within the provisions of the statute.”
In Lamberton v. The State, 11 Ohio, 282, an indictment which merely used the words of the statute was held, in that particular instance, to be too uncertain, because of the generality of its terms. The court thought that the particular act complained of, and which was included in the general *words of description in the [235 statute should be set forth ; and, in illustration of their views, said : “ It (the indictment) is as general as would be an indictment for forgery, which followed merely the words of the statute without specifying any act constituting the crime, or an indictment for perjury, which only set forth that a party swore falsely, knowing to the contrary, without setting forth what matters he stated to be facts, and falsifying them.”
Now, certainly, an indictment that simply charged a forgery of a “ contract for the payment of money,” without further description, would be bad. The forged instrument must be set forth “ in Ticec verba,” that the court may see, by an inspection of the indictment, that it is an instrument which is the subject of forgery; and where it is so set forth, and appears to be an indorsement of a promissory note, the indictment is none the less certain because the instrument-is called by its specific name, an indorsement, than it would be if the more general description, “ a contract for the payment of money,” were used; indeed, it is more certain.
In United States v. Bachelder, 2 Gall. 15, it was held, that in an indictment for a statutory offense, it is sufficient if the offense is substantially set forth, though not in the exact words of the statute. To the same effect are the reasoning and decisions of the court in the cases in 18 and 19 Ohio, above cited.
But while we can not say that the indictment is defective because it does not employ the precise words of the statute, yet, it-must be admitted that in some other particulars, it is very loosely drawn; and were it necessary to the decision of this case, to pass upon its *236, 237 deficiency, we would feel it to be our duty to give it further consideration. "VTe think the court erred in permitting Kyle to testify. He had been convicted of the crime of forgery and sentenced, and his sentence had not been reversed or annulled. Had he been condemned to imprisonment in the penitentiary, it would not bo pretended he was a competent witness. For the 41st section of the crimes act 286] provides, “that any ^person sentenced to be punished for any crime specified in this act (when sentence shall not have been reversed or annulled), except under the 3d and 25th sections, shall be deemed incompetent to be an elector, juror, or witness, or to hold any office of honor, trust, or profit within this state, unless the said convict shall receive from the governor of this state a general pardon under his hand and the seal of the state; in which case, said convict shall be restored to all his civil rights and privileges.”
The 3d and 25th sections relate to manslaughter and dueling.
But it seems to have been considered by the court, that as Kyle was not sentenced to imprisonment in jhe penitentiary, but only to confinement in the house of refuge, in Hamilton county, pursuant to the acts of assembly of February 8, 1847 (45 Ohio L. L. 113), and March 25, 1851 (49 Ohio L. L. 121), the above section of the crimes act was not applicable, inasmuch as it requires a sentence to punishment, in order to disqualify. It is true, that the confinement of a boy under sixteen years of age, in the house of refuge, is not called punishment, in the above-mentioned acts of 1847 and 1851, and there are expressions in them that tend to show that the omission to call it so was designed. Nevertheless, we are very clear that such confinement, when the result of a conviction, by jury, of crime, is to be regarded as punishment, and that it is none the less so because its principal object is the reformation of the offender. That is one of the objects of most punishments, in a civilized country, and whether it is a principal or a minor consideration, does not affect the question whether the sentence is to punishment or not. Confinement in the house of refuge, or subjection to the control of its directors, is a restraint of liberty, and when it is consequent upon a conviction and sentence for crime, it must, to be constitutional, be regarded as punishment. Const., art. 1, secs. 1, 6. But Kyle was not simply restrained of his liberty. He was not merely placed under the control of the directors as his guardians. He was con-287] derailed to *hard labor for over five years, unless sooner legally discharged, and to pay the costs of prosecution. Surely *238 this is punishment; surely it is a sentence that might be pleaded in bar of another prosecution for the same offense; and unless we are prepared to admit that the 41st section of the crimes act has no application except in cases where the very punishment prescribed in that act as inflicted, we must say that the witness was disqualified. But to make this admission would be to lose sight of the reason for the disqualification. It is not merely to punish the criminal, that he is rendered incompetent to testify. If that were the sole, or principal reason, the law would be eminently absurd. The true ground of exclusion is the infamy of the crime. A person capable of committing either of the offenses specified in the crimes act, manslaughter and dueling excepted, was deemed by the legislature wholly unworthy of credit. It was therefore thought politic to exclude him from the witness-stand. But he could not properly be called guilty before sentence. For the verdict might be defective, or however regular, might be contrary to the evidence, or unsupported by it, and for these, or other sufficient reasons, might be set aside. So, for good cause, the judgment might be arrested. Hence, it was proper to provide that the disqualification should not take place until sentence. Before then, it could not safely be said that the person was infamous.
These views are fully sustained by the authorities. People v. Whipple, 9 Cow. 708; 1 Arch. (Waterman’s ed.) 155, note 1, and cases there cited.
It may be proper here to remark that, were the question fairly before us, it might be a subject of serious inquiry whether the sentence upon Kyle was not erroneous. It is certainly worthy of consideration whether forgery can be punished in one manner in Hamilton county, and in another, and much more degrading manner, in every other county in the state, under a constitution which declares that “ all laws of a general nature shall have a uniform operation throughout the state.” But it is unnecessary in this case to pass *upon this question, and I only allude to it lest it might [288 be inferred from silence that we recognize the correctness of the sentence. If it were admitted that it is erroneous, We are not prepared to say it is void; and as it remained in full force when Kyle was offered as a witness, he was incompetent.
The fourth assignment of error is,that the court put the plaintiff in error upon trial a second time, after having, without his consent, and without any sufficient reason, discharged the jury first inman *239 eled and sworn to try his case, and thus placed him a second time in jeopardy.”
By the record it appears that, at the February term, 1854, the prisoner, being arraigned, pleaded not guilty, and thereupon a jury was impaneled and sworn to try him, and the trial progressed. The record then proceeds as follows: “And the jury aforesaid, after hearing the testimony of witnesses, arguments of counsel, and charges of the court, retire under charge of the sheriff to consult of their verdict. And affjer the jury having retired, the court received the following note: ‘Hon. Judge Flinn, we can not agree on our verdict. One of our jurors is not a naturalized citizen. We want your opinion to see if we can’t be discharged.’ And the jury aforesaid being brought into court, court ordered said jurors to be discharged from the further consideration of this cause.” This is all that appears in the record in reference to the discharge of the jury. At a subsequent term, to which the cause was continued, the prisoner was again put on trial, convicted, and sentenced.
That a jury may be discharged by the court in a criminal case, where they can not agree, without its operating to acquit the accused, was expressly decided in Henley’s case, 6 Ohio, 399, and we are not disposed to question that decision, supported as it is by numerous authorities, although decisions of an opposite character may be cited against it. Whether they can be discharged because it is discovered that one of them is not qualified, neither the state nor the prisoner objecting to him, is another question, upon which we find it unnecessary to express an opinion.
239] *That the power to discharge is a most responsible trust, and to be exercised with great care, is too obvious to require illustration. “ It is a discretion,” said Mr. Justice Story, “ to be exercised only under very extraordinary and striking circumstances.” 2 Gall. 364. “The power,” said the same judge, “ought to be used with the greatest caution, under urgent circumstances, which would render it proper to interfere.” U. S. v. Perez, 9 Wheat. 580. “ I am of opinion,” said Chief Justice Spencer, “ that, although the power of discharging a jury is a delicate and highly important trust, yet that it does exist in cases of extreme and absolute necessity.” People v. Goodwin, 18 Johns. 187.
That the discretion is a “ legal discretion, and to be exercised according to known rules,” was expressly held in McKee’s case, 1 Bailey, 651, recognized in Mount v. The State, 14 Ohio, 304.
*240 That it ought to be exercised in eases of mere disagreement only after a long effort of the jury to agree, and when there is no reasonable hope of their doing so, is well settled.
That the reasons for the discharge ought to appear in the record seems to be generally supposed, since we find them thus stated in all the reported cases we have examined. But, in the present case, it is unnecessary for us to say what we would do were the record silent as to reasons. Such a case would present the question, whether a court of errors ought not to presume the existence of sufficient reasons ? Here, however, we have the reason stated, and there is, consequently, no room for presumptions. "We are, then, to decide upon the facts as they appear, whether the case was one in which the court could, in the exercise of a legal discretion, discharge the jury. If we find it was not; if we find that no case arose for the exercise of discretion, it will be unnecessary to inquire whether we have anypower to review the exercise of a legal discretion.
Now, for what reason were the jury discharged. Because they could not agree ? The record does not say so. Because one of them was unqualified? No such fact was found *by the court. [240 The only reason was that the judge received a note from some one, it does not appear whom, saying that the jury could not agree, and that one of them, whose name is not given, was not a naturalized citizen. They were thereupon brought into court, and without any inquiry being made whether they had agreed or could agree, or whether any one of them lacked the necessary qualifications, and without any statement whatever by them to the court, they were discharged. It was not even ascertained that the note was sent by them, or by any one of them; and, so far as appears, such may not have been the fact. It was not ascertained that either of them was unqualified, and the presumption therefore is that they were qualified. It does not appear that they deliberated long, or that there was any good reason to believe they were unable to agree. No assent to their discharge was given by the prisoner, nor is it shown that he was even cognizant of the cause of their dismissal. In a word, the only grounds for the discharge, that are found in th'e record, are the unverified statements of an anonymous note.
Now, it does seem to us, that this was no case for the exercise of that “ delicate and highly important trust,” that only exists “ in cases of extreme and absolute necessity;” and that were we to *241 sanction what was here done, it would allow to a judge an absosolute and uncontrollable, instead of a legal discretion.
We arc therefore unanimously of opinion, that the discharge of the jury was, under the circumstance, unauthorized by law, and it only remains to be considered whether the prisoner could afterward be again tried, consistently with the provision in the constitution, that no person shall “ be twice put in jeopardy for the same offense.” Art. 1., sec. 10. There are decisions entitíed to great respect, that a prisoner is not put in jeopardy, unless a verdict has been rendered in his case. But the weight of authority, we think, is otherwise, and we consider the law as settled in this state by Mount’s 241] case, already cited. It was held in that case that *after a jury is impaneled and sworn, if a nolle prosequi be entered by the prosecuting attorney, with.leave of the court, and without consent of the prisoner, and the jury be discharged without rendering a verdict, it is a good bar to another indictment for the same offense. And in Henley’s case, 6 Ohio, 402, in which the jury were discharged because they could not agree, the court said that if the power to discharge did not exist, “ the court were clearly in error in putting the plaintiff in error a second time on his trial on this indictment, for no rule is better settled than that which prohibits putting a person twice in jeopardy for the same crime; and our constitution is nothing more than the common-law principle on that subject,”
Let an entry be made reversing the judgment of the criminal court, and discharging the prisoner.