Ned, a slave, *vs.* the State.

NED, A SLAVE, *VS* THE STATE.

1. It is good cause of challenge to a juror, that he has formed and expressed an opinion of the innocence or guilt of a prisoner, from conversations held with jurors, who had been previously charged with the trial of the prisoner.

2. The Circuit, is prohibited from referring to the Supreme, court, any question of law arising in a criminal case, except it shall be novel and difficult,—Therefore, no matter can be brought to the view of the Supreme court in such a case, by bill of exceptions;

3. Nor can the decision of the Circuit court be reviewed on any point *dehors* the record.

4. But the Supreme court will not be particular as to the form of reference of matters for revision, if it clearly appear from the record, that a reference was intended.

5. *It seems*, that a bill of exceptions was unknown to the common law, and that the right exists in civil cases, only by virtue of the statute.

6. Whether the decision of the Circuit court on a challenge, may not be placed on the record, without a bill of exceptions, *Quere.*

7. The discharge of a jury, for no better cause than that the jury were not agreed, is irregular, and unwarranted by law.

Ned, a slave, vs. the State.

8. *Secus*, where the jury have been discharged, in consequence of the expiration of the term of the court.

9. *It seems*, that the provision of the declaration of rights, which provides that no person shall, for the same offence, be twice put in jeopardy of life or limb, is a very ancient maxim of the common law, but has never, in England, been decided to extend further than to cases of acquittal and conviction.

10. Whether the provisions of the declaration of rights extends to slaves,—*Quere.*

11. Where, by a reversal of judgment, the prisoner can be placed in the same position which he occupied when the error was committed—*it seems*, it might be considered that his life was never in danger, and that he might be subjected to a new trial: —*aliter*, where he cannot be placed in such position.

12. The unwarrantable discharge of a jury, after the evidence is closed, in a capital case, is equivalent to an acquittal.

On a writ of error, awarded to the Circuit court of Clarke county.

In this case, the plaintiff in error, as the property of Mrs. Winifred W. Creagh, and her husband, Thomas B. Creagh, was indicted at the October term of the Circuit court of Clarke county, eighteen hundred and thirty-six, for the murder of Lorenzo Johnston, *alias* Renzy Johnston.

Wednesday, the thirteenth of October, having been set apart for his trial, the plaintiff in error appeared in his proper person, and having plead not guilty, declared himself ready for trial. The following extract from the record, shews the disposition of the case at that term:

" The jurors elected, tried and sworn, to speak the truth upon the traverse at issue, &c. on their oaths say, that they cannot, by any reasonable probability, agree

Ned, a slave, vs. the State.

upon a verdict,—and the jury having been impannelcd for forty-eight hours, and having been out considering of their verdict for about thirty-six hours, and it appearing to the satisfaction of the court, that they cannot agree: It is ordered by the court, that the said jury be discharged. It is further ordered by the court, that the prisoner be remanded to jail, for trial at the next term of the court."

At the Spring term of the court, eighteen hundred and thirty-seven, the court ordered the sheriff to summon fifteen talismen, to be and appear on Thursday, the twenty-third instant; which number, together with those in attendance on the original pannel, were for the trial of the prisoner. The plaintiff in error appeared, and a list of thirty-six jurors were furnished to him. The jury came into court by order of the presiding judge, a few minutes before mid-night, and declared in open court, that they could not agree upon a verdict. They were, therefore, because of the expiration of the term of the court, discharged.

At October term, eighteen hundred and thirty-seven, of the same court, Thursday was set apart for the trial of the prisoner, and the sheriff was directed to summon forty-seven good and lawful men, &c. and a list of the same was furnised to the counsel for the prisoner, two entire days before the trial. On the trial, the jury returned a verdict of guilty, and his value was assessed at eight hundred dollars. The prisoner was sentenced to be executed on the last Friday in January, eighteen hundred and thirty-eight, and the case was brought to this court, on the following bill of exceptions:

" Be it remembered, that on this day, to wit, on Thurs-

day, the fourth day of the term aforesaid. this cause came on to be tried, and in empanneling the jury, one Richard Pace was sworn to answer questions, and being asked whether he had formed and expressed an opinion of the guilt or innocence of the prisoner, answered he had; being further asked, whether that opinion was formed upon rumor, or a knowledge of the facts, he replied, that his opinion was formed by conversing with one of the jurors, who had previously tried the prisoner, to wit, at the last term of this court; whereupon, the counsel for the prisoner moved that the juror stand aside for cause, but the court would not sustain the motion, but put the juror aforesaid upon the prisoner, to which the prisoner, by his counsel, excepted. After this, Amos C. Wilson, James Cleveland and Stephen Williamson, were in like manner sworn to answer questions, made like answers to Pace, and were severally put upon the prisoner, although exceptions were in like manner made. After the prisoner had exhausted his challenges, John Gillus and Archibald Campbell were called as jurors, and also sworn to answer questions, and answered they had formed and expressed opinions, which opinions were formed, by conversing with jurors who had tried the prisoner at the last term of this court: whereupon, the prisoner moved that said jurors be set aside for cause, but the court overruled the motion, and the said jurors were put upon the prisoner, and were sworn of the jury, to which the prisoner excepted, &c.

"This is signed as a bill of exceptions strictly, and that the defendant may use, in case he has a right, to a writ of error, which is suggested, but it is not intended as a reservation of points under the statute."

Ned, a slave, *vs.* the State.

The following was the assignment of errors:

1. That no sufficient caption or other entry, appeared in said record, shewing that an indictment was duly preferred and found against the prisoner, or that he was ever arraigned for trial;

2. No entire list of the jury was served upon the prisoner below, as required by law, at any time, previous to said prisoner's being put upon his trial;

3. That two mistrials were awarded against the prisoner, and two several juries empanneled and sworn in said cause, were discharged by the court, without proper cause, and against the consent of the prisoner;

4. That the court erred, as stated in the bill of exceptions.

For these, and other errors apparent in the record, the said plaintiff, by his counsel, prayed a reversal, and discharge of the prisoner.

*Porter*, for the prisoner, argued—

1. That the question, whether the prisoner could have the advantage of a bill of exceptions, depended not only upon a construction of our statutes relating to writs of error; but also upon the peculiar structure of that enactment, authorising a bill of exceptions.

This court (Lynes vs the State, 5 Porter, 236,) had determined, that a writ of error lies in a criminal case; and had drawn a distinction as to the manner by which one should have the advantage of the writ. The court, in that case, ruled, that in criminal cases, the writ must issue from this court, *ex gratia.*

The power, which this court possesses to control infe-

Ned, a slave, *vs*. the State.

rior jurisdictions, is derivable under the constitution, which authorises the Supreme court to issue such remedial and original writs, as may be necessary, to give it a general superintendence and control of inferior jurisdictions.—If this provision means any thing, it means that in *all* cases, *all* writs, necessary to this purpose, to wit, the control of an inferior jurisdiction, may be issued— Bell vs Payne, et al, 2 Stew. 413. If the power thus defined had been left here, this court, in exercising it, might well look to the common law, for the rules and regulations by which to give effect to the power. But the statute of eighteen hundred and fourteen, (Aikin's Digest, 237, s. 4,) which seems to have been intended to carry out the constitutional provision, prescribes that the Supreme court shall have power *to issue forth writs* of error, &c. to remove *any* judgment or decree either at common law, or in chancery. This statute contains a remarkable clause, (remarkable, because bearing very directly upon the *ex gratia* power of issuing writs in felony,)—to wit,—*but no cause shall be removed until after final judgment, except the judge doubts; when he may respite final judgment, and refer the question to the Supreme court.*

This statute, it appears to me, clearly establishes the intention of the Legislature, to extend the principles of the common law, by giving a remedy controlling inferior jurisdictions *before* final judgment in a cause. And it is easy to account for this innovation upon principles regulating the removal of cases from an inferior to a superior tribunal. The writ of error was a common law writ—It only lay, *after* final judgment, but to provide

Ned, a slave, vs. the State.

for cases of doubt in law, arising *before* final judgment, the law was enacted. Two distinctions are to be kept in view—1. That the remedy bringing a case into this court, by a reservation of a question, when the judge below doubts, only arrests, or in the language of the statute, only respites *judgment*—while a writ of error or appeal, arrests or respites *execution*. And 2. That a statute, not the common law, is to be looked to, in this State, as the source of the writ of error—the first being looked to, for the *grant* of the writ, the latter for its *form*. If these distinctions are kept in view, it will, I think, be seen to follow, that the difference between *ex gratia* writs of error, and those, *of course*, depends entirely upon the grant of the writ, at common law : and, if so, the right to a bill of exceptions follows in the train of the same principle.

A bill of exceptions, is, in most cases, an accompaniment of a writ of error : for it can only be used in error, and where error does not lie, a bill of exceptions cannot. —Buller's N. P. 316 ; Phil. Evid. 215. For what would be the utility of a writ of error, except for mere errors of law, arising on the pleadings, if a party's right to a bill of exceptions, by which he could only show error of the court, in rejecting testimony or otherwise, were restricted by the will of the judge? Where the necessity or benefit of our statute, enforcing a judge to sign and seal a bill of exceptions?

It is clear, then, to me, that a bill of exceptions, in a criminal case, must follow the issuance of a writ of error : and this latter, is a matter depending entirely, as I

7 P.                    25

Ned, a slave, *vs.* the State.

believe, upon the words of the statute, where one obtains, or, upon the common law, where there is none.

At common law, a writ of error could only be brought, for error of law, apparent upon the record. Where, in such case, an objection was made, *ore tenus*, and overruled by the judge, no redress remained. To remedy this matter, the statute (13 Edward, 1, s. 31,) required the judges, where one was impleaded before them, and made exception, to sign it; and if one would not, another should.

Now, this statute being the origin of bills of exception, all power of signing them, and all rights under them, must have depended upon the construction of the statute. This construction, in reference to the allowance of a bill of exceptions in criminal cases, has never seriously received, so far as my research goes, the solemn adjudication of the English courts. It has been hinted at, made the dicta of judges, but as an abstract question, has not, I believe, had the deliberate action of the English judges. Lord Coke, in his definition of the statute of Edward, says, exceptions extend to all actions, real, personal and mixed: but he is silent as to criminal cases.

The most early and prominent case, where the question was considered, and then, only as an incident, was Sir Harry Vane's case, on a trial for Treason. There, the court refused to sign a bill of exceptions; and why, —because, say they, civil cases, between party and party, are only within the statute. It is upon this authority alone, I am prepared to say, that elementary writers, have set it down as law, that bills of exception are not

Ned, a slave, *vs.* the State.

allowable in criminal cases. Hawkins *only infers*, on the authority of this case, that bills of exception do not lie in treason and felony—Hawk. P. C. B. 2, ch. 46, s. 210.

But Lord Hardwick says the point is not settled—Rex vs Inhab. Preston, Rep. Tem. Hardw. 251.

The fact, then, that a judge, in order to protect himself, under a refusal to sign exceptions in a case of treason, may have declared that the statute extended only to civil cases, is not *stare decisis.* Lord Hardwick, to be sure, says, (Rep. 251,) that it has never been determined, that exceptions *did lay* upon criminal causes, save in the Exchequer—but he does not say, that it had been determined they absolutely did not.

It occurs to me, that the judges who construed this statute, must have been guided in their construction, by the principles of the common law, respecting writs of error, —and as they saw that at common law, writs of error issued only *ex gratia,* in treason and felony, and of course, in civil cases; so, it would be inconsistent with this distinction, to allow exceptions, of right, in all cases, whether criminal or civil. This is the more apparent, from the fact, that the *ex gratia* power of the superior judges, to issue writs of error, would be nugatory, without the power of enforcing a bill of exceptions. To what end might the party, complaining of a most positive and tyranical breach of the law, take his writ of error, if the spreading upon the record the circumstances of the case, could be arbitrarily withheld? Why, the writ of error would be a mockery : and judges, shielding themselves behind this power, might break down every

Ned, a slave, *vs.* the State.

protection, securing to the citizen the enjoyment of his liberty or his life. I am led, then, to the conclusion, that as the statute of Edward, was only extended by construction, to civil cases,—the signing of exceptions, in criminal cases, as was the issuance of writs of error, —was not, of course, but *ex gratia:* and the same power which might be exercised by the superior judges, to compel an attorney general to consent to the issuance of a writ, could compel the inferior court to sign and certify exceptions which might have been taken,—a power which was always exercised by mandamus.

Now, I cannot be met by the assertion, that this matter has been adjudicated in the American courts, because the only cases of note, are those of the New York tribunals; and it will be sufficient to remark in reference to these, that the statute of New York, respecting the signing of exceptions, is identically the English statute, in almost its very words. And I maintain that the conclusions to which I arrive, are sanctioned by the fact, that the New York courts, while they have decided that writs of error are grantable only *ex gratia* in felony, have also decided, that mandamus will lay to compel the signing of a bill of exceptions. A decision which would never have been necessary, if in England and New York, statutes had, like ours, given a cumulative remedy, in cases where the judge might refuse to sign exceptions —2 John. C. 118; 1 Caine's R. 511; 6 John. 279; 2 Caine's R. 373. That such a statute in England or New York prevails, I cannot discover.

Admitting, then, the English and New York statutes to extend only to civil cases, will this court say, that our

statute extends in like manner only to civil causes? Can any reason be imagined why a judge could be forced to sign exceptions, where the sum of twenty dollars was at stake, and not where the life of the party was involved? Or what would be the use of this court extending its grace in the issuance of a writ of error, when the same grace could not force a judge who had tried the case, to certify the exception? Suppose a cause to occur, where a packed jury had tried one, and the fact that this jury appeared on challenge to the array, to have expressed a determination to hang the prisoner, and after conviction, the court should refuse to certify the exception, and refuse to suffer the answers of the jury to appear upon the record, or to reserve the point—can it be intimated, that in a case of this kind, the party would have no remedy? Can it be possible that our law is so defective, that while around the liberty and life of the accused, the constitution has erected so many barriers and safeguards,—merely through a common law technicality, a man cannot, in the most important trial to which he can be subjected, have the revising adjudication of this court? I cannot believe it. The necessity of the case alone, furnishes the best argument that can be adduced, that the writ of error, by the statute of this State, whatever it might be at common law, is one of right, issuable of course; and that the exception on which alone it can, in most cases, be founded, must follow as an incident. But if this court should adhere to the opinion expressed in Lynes vs the State, that a writ of error is one allowable *ex gratia*, on application to this court—then, even the power to issue the writ, would be

of no avail, if not followed by the power to have the exception certified, and the error placed upon the record : a power, whether enforced by mandamus or under the statute, to me clearly allowable in either civil or criminal cases.

We have seen that the reason why the statute of Edward was enacted, was that if judges refused to allow an objection made *ore tenus*, there was no remedy. What mischief could accrue in civil cases, which could not obtain to a tenfold extent in criminal? Or could judges be allowed to reject law in a criminal case, which, in a plea of debt, might avail the defendant? It is said by some of the judges—if bills of exception were allowed in treason and felony, they would be taken upon every trial. This shews, that if taken at all, it should be upon the grace of the superior court, only where the merits of the case might require a writ of error.

Any other construction of our statute, would make the reservation of a novel and difficult point, the only means by which a criminal could have the benefit of this court. Is this congenial to the spirit of our institutions? Or does it carry out the beautiful provisions of the constitution?

It will be observed, that I do not attempt to test the correctness of my positions, by the common law rules, or by the construction of the English statute. The common law of England,—that venerated source of some of the most excellent provisions of our statute law, has been only adopted in this country, so far as is consistent with the spirit of our institutions—and it seems to me, that it is inconsistent with these institutions, to thus

Ned, a slave, vs. the State.

trammel in criminal cases, the right of appeal. So far as the statute law of England, and our own State are concerned, I hold there is a material distinction.

2. In reference to the mistrials which have occurred in this case, I assume the positions—

1. That a juror may be withdrawn under some circumstances—as the illness of a juror—of a witness—of the prisoner,—and, as ruled in Nugent's case, in the event of the illness of the judge—4 Stewart & Porter, 72; 3 Ld. Raym. 21; 11 Har. State Trials, 275; 4 Taunt. 309; 2 Leach C. C. 706; Ib. 618. Also to let the prisoner into a defence—Foster's C. L. 31.

2. But without the consent of the prisoner, it cannot be done—Foster's C. L. 17; Ib. 31; 2 Stra. 984, 985; Hawk. b. 2, c. 47, s. 1: Com. Dig. 701, indictment M.; Foster's C. L. 30; 2 Hale, 294.

3. The courts will never permit this consent to prejudice the prisoner—Foster's C. L. 31.

4. The test of the power of courts to authorise the withdrawal of a juror depends on the fact, whether it would operate *favorably*, or *indifferently* to the prisoner— wherever this does not appear, the effect of a mistrial, is an acquittal—1 Chitty's C. L. 631; 2 Caine's R. 304; 18 Johns. R. 187.

The *Attorney General*, for the State, made the following points:

1. Court cannot look to bill of exceptions in this case.

Our statute says, "If, in the trial of any cause, either the *plaintiff* or *defendant*," &c.—Aik. Dig. 254.

The English statute says, "When one that is implea-

Ned, a slave, *vs.* the State.

ded before any of the justices, doth allege an exception," &c.—See 1 Starkie's Ev. 431. They are very similar. If there is any difference, our statute more manifestly relates to civil causes alone, than the English statute— 13 Ed. 1.

It has been repeatedly held, that the English statute does not allow a bill of exceptions, in a criminal case— Sir H. Vane's case, Kel. 15; Ld. Grey's case, 1 Vernon, 175; Buller's N. P. 316; Willis, 538; Rex vs Barkshead, T. Raymond, 486; Chit. C. L. 623, margin; 1 Saunders' Pl. & Ev. 318; McNally's Ev. 325, 329.

The New York statute is precisely similar to the English. The doctrine appears to have been considered so well settled, that there are few cases touching the point. In People vs Holbrook, 13 John. R. the court treat it as a matter no longer open for argument;—on the force of the English decisions, I presume.

That prisoner may be tried again, where the jury have been discharged by the court, after they cannot agree— See 2 Hale, 295; United States vs Coolidge, 2 Gall. 364; Com. vs Bowden, 9 Mass. 494; The People vs Godwin is a leading case, 18 John. Rep. 200, 207;—9 Pickering, Com. vs Knapp, 515, the same thing was done apparently without objection. See also People vs Green, 13 Wendell, 55.

GOLDTHWAITE, J.—If the bill of exceptions, found in the record of this cause, can be considered by the court, it will be evident, when we recur to the decision of this court, in the case of the State vs Quesenberry, (3 Stewart & Porter, 308,) that the Circuit court ought to

Ned, a slave, *vs.* the State.

have sustained the prisoner's challenge to the jurors. In the case cited, the juror stated that he derived the information on which his opinion was founded, from a man in whose veracity he had implicit confidence, who said he received his information from one of the witnesses: an opinion, formed on such information, and expressed, was determined by this court, a cause sufficient to exclude a juror, if challenged. In this case: the juror challenged, had formed his opinion from conversations held with a juror, who had been empanneled on one of the juries, previously charged with the trial of the prisoner; the information was consequently derived through the medium of witnesses, and the only distinction between the grade of information, is, that in the one case, the witnesses were sworn; in the other, they were not.

But the prisoner, can derive no benefit, before this court, from this opinion; because we have no authority to review the decision of the Circuit court, or any point *dehors* the record; and no matter can be brought to our view by a bill of exceptions. The general assembly has prohibited the Circuit courts, from referring to the Supreme court, any question of law, arising in a criminal case, except it shall be novel and difficult—Aik. Dig. 257. The statute does not prescribe the manner in which a reference shall be made: but in the case of the State vs Prince, (3 Stewart & Porter, 253,) it was held, that this court ought not to be particular as to the mode, if it clearly appear by the record, that a reference was intended. The contrary, is made directly to appear, as the judge states, in the exception, that he has signed it as a bill of exceptions, and does not intend it as a reserva-

7 P.                    26

tion of points under the statute. It is clear, that a bill of exceptions was unknown to the common law, and it is alone by virtue of the statute, that the right exists in civil cases. Our statute is not materially different from the English act of parliament, or from the statutes of our sister States, and it is unnecessary to go into an examination of a question which has so often been settled —Rex vs Sir Harry Vane, (1 Levins, 68;) Rex vs Inhabitants of Preston, (cases Temp. Hard. 251, S. C.) 2 Strange, 1040; Bacon's Ab. vol. 1, 528; 2 Hawk. P. C. ch. 46, s. 123; United States vs Gibert, et al, (2 Sumner,) 19; People vs Holbrock, (13 John. R. 90.)

We must not, however, be understood as deciding, that the decision of the Circuit court, on a challenge, may not be placed on the record, without a bill of exceptions. It is stated in 3 Bacon's Abr. 766, that if a challenge is demurred to and overruled, it is entered on the original record: and if at *nisi prius*, it appears on the *postea* what the judge has done. Whether this method is the proper course to be pursued, is not a question now before us. A very important subject of consideration is presented by those assignments of error, which question the existence of any authority in the Circuit court to discharge a jury under the circumstances disclosed by this record. If the discharge of either jury was irregular, and not warranted by law, we are then called on to declare what are the consequences which must ensue, so far as the prisoner is concerned.

The ancient authorities on criminal law, announce the general rule, "that a jury once sworn and charged in a case affecting life or member, cannot be discharged without giving a verdict."

Ned, a slave, *vs.* the State.

( Lord Coke says, in his third institute, (pp. 110,) " To speak it here, once for all, if any person be indicted of treason, or of felony or larceny, and plead not guilty, and thereupon a jury is returned and sworn, their verdict must be heard, and they cannot be discharged." Again, in the first institute, (pp. 227, b.) he observes, " a jury sworn and charged in case of life or member, cannot be discharged by the court or any other, but they ought to give a verdict." )

In Bro. Abr. (tit. verdict pl. 49,) it is said, " *a verdict de* xi *ou le* xii, *ne voet agree est void verdict: et per curiam, les justices duissot aver eux carry in cartes eve eux tanq. ils sera agree.*"

In Rex vs Ledingham, (1 Vent. 97,) it was determined, ( " that in cases of life and member, if the jury cannot agree before the judges depart, they are to be carried in carts after them, so they may give their verdict out of the county." / The rule, as stated by Lord Coke, has frequently been questioned by the English courts, on account of its apparent exclusion of cases of consent and necessity ; but its soundness, as a general rule, has always been admitted by them. Many exceptions have been established by adjudication, some of which will be hereafter noticed. ( Hawkins, whose excellence as a compiler, has never been questioned, says, " it seems to have been anciently an uncontroverted rule, and hath been allowed even by those of a contrary opinion, to have been the general tradition of the law, that a jury once sworn and charged in a capital case, cannot be discharged (without the prisoner's consent,) till they have given a verdict. And notwithstanding some authorities to the

Ned, a slave, *vs.* the State.

contrary, in the reign of King Charles the Second, this hath been holden for clear law, both in the reign of King James the Second, and since the revolution—2 Hawk. P. C. ch. 47, s. 1. At a much later period, and when we might reasonably suppose this subject must have been repeatedly discussed and settled by the courts, we find Blackstone thus stating the rule: "When the evidence on both sides is closed, and indeed when any evidence hath been given, the jury cannot be discharged (unless in cases of evident necessity,) till they have given in their verdict"—4 Black. Com. 360.

Lord Hale does not state any general rule, but he adverts to the custom of carrying juries who did not agree, around the circuit, and says, this must be done—(2 Hale's P. C. 297.) A practice wholly inconsistent with the existence of a discretionary power to discharge a jury. We are not to suppose that jurors were transported from county to county in a cart, as a mark of ignominy and disgrace, or as a punishment for their contumacy in refusing to agree. It is highly inconsistent, to imagine that a people, who, under all changes of government, during a period of near one thousand years of authentic history, have clung to the trial by jury, as the great means of preserving their liberties from the oppression of those in power, would ever acquiesce in a practice, well calculated to bring the institution itself into contempt; but, on the contrary, we are, I think, compelled to arrive at the conclusion, that this custom arose from a jealous regard for the preservation of the right of trial by jury; and from a defect of power in the courts to abridge this right, or to lay down any new rules as to its

Ned, a slave, *vs*. the State.

exercise. The custom, as well as the reason of it, is adverted to in a late case by Mr. Justice Gaselee, and stated in a note by the reporter—Morris vs Davies, et ux, (3 Carr. & Payne, 427.) On the English circuits, the judges have but one commission of assize, and of oyer and terminer, for the whole circuit, although their commission of goal delivery, is special, for each county. The jurisdiction, therefore, of the judges, as a court of trial, only terminates with the circuit. As the court has no power to discharge the jury, and as its functions cease at the end of the circuit, the jury are kept in attendance, and when the judges depart from the bounds of the last county, the duties of the jury necessarily end with the existence of the court to which it is attached.

As none of the elementary writers, before quoted, have given any reasons for the existence of the rule stated by them, many subsequent judges have supposed it to be a mere tradition of the common law, having no adjudicated case to support it. That this idea is unfounded, the case of Rex vs Ledingham, (the case cited from Bro. Ab.) and the concurrent testimony of Lord Hale and Blackstone, tend to show—(2 Hale's P. C. 297; 3 Black. Com. 376.) Lord Hale cites two adjudications in support of his text—19 Assiz. 6, and 41 Assiz. 11.

It is scarcely possible, that in the course of the centuries, during which the trial by jury has been preserved in England, that cases should not have occurred, in which juries have not agreed; yet we no where find any cases, except those in the reign of Charles the Second, in which judges have claimed the discretionary power to discharge juries. If we examine the cases, we

Ned, a slave, *vs.* the State.

shall find, that so far from claiming this power, it is in all, except those before stated, expressly, or by implication, denied. Mansel's case, reported in 1 Anderson, 103, is not before us, but from the statement of it by Mr. Justice Foster—(Foster, 31,)—I infer, that some verdict which the court ought to have received, was, in point of fact, agreed on by the jury; and that they would agree on no other : this being the case, the judges induced the prisoner, who, according to the custom of the times, was unaided by counsel, to agree, that a juror might be withdrawn, and with his consent, thus induced, a mistrial was ordered. Mr. Justice Foster reprobates this conduct of the judges, saying, the jury not being agreed on any verdict at all, nothing remained to be done by the court, but to send them back, and to keep them until they should agree to such a verdict as the court could have received and recorded. If the want of agreement on a verdict, furnished of itself, a sufficient reason to discharge the jury, why was the consent of the prisoner required, and why does the case call for the reprobation heaped on it by the eminent judge, whose opinion I have just quoted? In the cases of Whitebread and Fenwock, (the two which occurred in the reign of Charles the Second,) juries were discharged after evidence given and closed ; because it was not sufficient to convict, and in order that the crown might be better prepared on another trial. These cases are never mentioned but to be reprobated, and nearly all the judges of England condemned them as cruel and *illegal*, and Mr. Justice Foster hopes they may never be drawn into example. I am free to confess, that I can perceive no sound distinction, between a dis-

cretion exercised in discharging a jury after the evidence
is heard, and the same discretion exercised because a ju-
ry cannot agree.　In both cases, the jury is discharged,
because the evidence is not sufficient to convict; but, in
the one case, the opinion is formed by the judge, and on
the other, by a portion of the jury.　The result to the
prisoner is the same, in each case : he is tried again, and
the State may be better prepared on the second trial.
In the case of the Kinlock's, (Foster, 17 to 40,) the whole
subject underwent the deliberate consideration of ten of
the English judges : it was made a question in this case,
whether a prisoner could consent to a discharge of a ju-
ry, even when he was thereby let in to claim an advan-
tage, which he might otherwise have lost; and it was de-
termined by nine judges against one, that he could.　I
understand all the judges; as admitting the general rule
to be a good one, which is laid down by Lord Coke, *but
that it is not universally binding;* nor is it easy to lay down
any rule which will be so.　Foster says 'the general
question' (touching the power of the court to discharge
jurors sworn and charged in capital cases,) 'is a point of
great difficulty, and of mighty importance, and I take it
to be one of those questions, which are not capable of
being determined by any general rule, that hath hitherto
been laid down, or possibly ever may be.'　And again,
after stating many cases in which the rule has no appli-
cation, he says: 'These instances, therefore, must be
considered as so many *exceptions to the general rule;*
though I confess, they do not come up to the case *of dis-
charging one jury, and bringing the prisoner to his trial
by another.'*　And again : "Upon the whole, my opinion

is, that all general rules, touching the administration of justice, must be so understood, as to be made consistent with the fundamental principles of justice: and consequently, all cases, where a strict adherence to the rule would clash with fundamental principles, are to be considered as so many exceptions to it."

The cases of exceptions are principally the following: Where a juror wilfully departed from the jury, and went out of town—2 Hale, 297 : Where the prisoner was suddenly taken ill, and obliged to be removed from the presence of the court—Meadow's case, (Foster, '76;) Streek's case, (2 Carr. & Payne, 413 ;) Stevenson's case, (Leach C. C. 618:) Where one of the jurors was suddenly taken ill, so as to be unable to proceed in the hearing of the case; Rex vs Edwards, (4 Taunt. 309;) Salcbert's case, (Leach C. C. 706 ;) Rex vs Edwards, (Russ. & R. C. C. R. 224 ;) (1 Hale P. C. 35.) Another class of exceptions may also be noticed, without our being understood as assenting or dissenting to their principles. These are those where a jury has been discharged, in order to the preferring a new indictment, better suited to the nature of the case; where, through the ignorance or collusion of the officer, or the mistake of the prosecutor, the fact laid differs from the real fact, or comes short of it in point of guilt —(Kelynge, 26, 52; Comb, 401 :) or, where undue practices appear to have been used to keep material witnesses out of the way—(1 Vent. 69; 2 Hale, 295 :) or, where the jurors have been tampered with—)Hillary T. Henry 7, Rel. 3, cited Foster, 27; Salk. 646.) The only English authority in which (so far as I can ascertain) the power is claimed for a court to discharge a jury, because they

Ned, a slave, *vs.* the State.

cannot or will not agree, is the Doctor and Student—Dial. 2 ch. s. 2: where it is asserted, "that if the jury will not agree, the justices may take such order as may seem to them, in their discretion, to stand with reason and conscience, by awarding a new inquest or otherwise, as they shall think best—like as they may do, if one of the jurors die before verdict." This is entirely an approved authority, but not more so than Lord Coke, Mr. Justice Blackstone, or Sergeant Hawkins; and the opinion of St.Germain cannot prevail against those names,supported, as they are, by the decisions adverted to.

Such are the English authorities; and they seem, in the main, consistent with each other; but when we come to an examination of the American cases, we find them so variant, and, in some cases, contradictory, that we are at a loss to deduce any general rule from them. In the United States vs Coolidge, (2 Gallison, 364,) a witness refused to be sworn, and Judge Story held, that courts possessed the discretionary power to discharge juries, whenever, in their opinion, the demands of justice required it. This opinion seems to be founded on an impression, that it was so ruled in Kinlock's case, though I think the extract before given, of Foster's judgment, shows that no such idea was entertained by the judges who determined it.

In the United States vs Perez, (9 Wheat. 579,) the same doctrine is held by the Supreme court of the United States, but they do not enter into an examination of the question.

In the People vs Olcott, (2 John. Cases, 301,) Chancellor Kent goes into a very full investigation of the subject,

and arrives at the conclusion, that courts have the power to discharge juries, whenever, in their discretion, they think it becomes necessary for the advancement of justice; and that an exercise of this discretion ought not to be revised, (in that particular case,) where a jury was discharged because they could not agree. This eminent jurist, after reviewing most of the authorities and cases before quoted, mainly founds his opinion, that there is no alternative between a *denial of the power* in all cases whatever, and *an unlimited discretion,*—on the reason, that whenever the exception of necessity, is once admitted, the court must necessarily judge the fact, and ascertain if it exists, and thus the matter is, in all cases, made an exercise of discretion.

Now, it seems to me, that such a conclusion does not properly follow. The judge must determine the existence of the facts, but when they are ascertained, the law determines whether they constitute a case of necessity. Thus, the judge ascertains the death or sudden illness of a juror,—the law pronounces this a case of necessity, that the jury shall be discharged. The court ascertains and determines that the evidence is not sufficient to convict—It even goes further : it ascertains the existence of other testimony, which, if adduced, would, or ought to convict—The law determines, that this cause is not sufficient to discharge a jury, and thus place the prisoner in jeopardy a second time. Again, the existence of cases, in which the jury *must* be discharged, as the death of a juror or the judge, shows, that power is not always discretionary.

The Supreme court of New York, in the case of the

Ned, a slave, *vs.* the State.

People vs Barrett & Ward, (2 Caine's, 305,) determined that a court did not possess the authority to discharge a jury, for want of sufficient evidence to convict, although such evidence was shown to exist, and to be in the possession of the defendants, and the judgment was arrested, because the first jury had been irregularly discharged.

In the subsequent case of the People vs Goodwin, (18 John. 187,) Chief Justice Spencer quotes this decision with approbation, and thus states his conclusion, as to the power of the courts: "Upon full consideration, I am of opinion, that although the power of discharging a jury, is a delicate and highly important trust, yet, that it does exist *in cases of extreme and absolute necessity*, and that it may be exercised without operating as an acquittal of the defendant: that it extends as well to felonies as to cases of misdemeanors, and may discreetly be exercised in cases, where a jury, from the length of time they have been considering a cause, and their inability to agree, may be fairly presumed as never likely to agree, unless compelled so to do from the pressing calls of famine or bodily exhaustion. And, in the present case, considering the great length of time the jury had been out, that the period for which the court could legally sit, was nearly terminated, and that it was morally certain, that the jury could not agree, before the court must adjourn, I think the exercise of the power was discreet and legal."

It should be noticed, that in this case, the jury declared only half an hour before the expiration of the term of the court, that there was not the least possibility of their agreeing. Whether this was sufficient to induce the con-

clusion, that a moral certainty existed, that within that time they would not agree, is a point which we will not determine; but in all similar cases, it would certainly be better to continue to the last moment, than to present a question exceedingly difficult of solution in principle. If we were disposed to acquiesce in the general correctness of the rule, as declared in the People vs Goodwin, we should yet be behind the New York decisions,—as in the late case of the People vs Green, (13 Wend. 55,) the court overleaped all barriers, and decided that the discharge of a jury is, in all cases, a matter of discretion with the judge trying the cause, and that its exercise cannot be reviewed.

In Pennsylvania—Commonwealth vs Cook, (6 Serg. & Rawl. 577,) it was decided, after great consideration, and a review of all the cases, ancient and modern, that a jury could not be discharged because they were unable to agree. And, in North Carolina, the doctrine has been carried to the extent of declaring, that when the jury did not agree within the time during which the court was authorised to continue, that the omission to return a verdict, was equivalent to an acquittal, and that the prisoner was entitled to be discharged, as he could never be legally tried by another jury—*Ex parte* Spear, (1 Dever. 491;) the State vs Garriques, (2 Hayw. 241.)

Although the American cases are thus variant, their attentive examination will aid very much in arriving at the true understanding of the subject, as it is very thoroughly discussed in many of them, and we cannot arise from the perusal of them, without being satisfied that each decision has much appearance of reason to

Ned, a slave, *vs.* the State.

support it, however adverse it may be to others. The prominent reason which has led to the adoption of the discretionary rule, seems to be the certainty that jurors will not always agree, and the apparent inconsistency of forcing them to agree by bodily exhaustion and confinement. This is assuming what should be proved. In no case ought a juror ever to be forced to any opinion whatever; but how can it be ascertained that they will never agree? Men may, and do frequently, honestly differ in opinion, and think that they shall ever continue thus to differ; yet experience demonstrates, that conviction often takes place, when the subject or the facts are again examined. The law declares, that every one shall be entitled to the benefit of a trial by jury, and as long as they continue in health, and capable of reasoning on his case, he is entitled to the exercise of these powers. Whenever from exhaustion or any other cause, a juror becomes unable to exercise these functions, and the fact is shown to the court to be such as much continue, then, a case of necessity has occurred, and the jury ought to be discharged.

As we are, in a great degree, thrown back on the English cases and authorities, for the determination of this case, I think we may deduce from them, certain general positions, which seem to be fully sustained.

1. That courts have not, in capital cases, a discretionary authority to discharge a jury, after evidence given;

2. That a jury is, *ipso facto*, discharged, by the termination of the authority of the court to which it is attached;

3. That a court does possess the power to discharge

Ned, a slave, *vs*. the State.

a jury, in any case of pressing necessity, and should exercise it whenever such a case is made to appear;

4. That sudden illness of a juror, or of the prisoner, so that the trial cannot proceed, are ascertained cases of necessity, and that many others exist, which can only be defined when partiular cases arise;

5. That a court does not possess the power, in a capital case, to discharge a jury, because it cannot, or will not agree.

When we test, by these rules, the proceeding had in this case, we find that the discharge of the first jury, having been for no other cause than the jury were not agreed, we are compelled to say it was irregular, and unwarranted by law: the second jury having been discharged in consequence of the expiration of the term, was, in itself, regular.

The effect, of this irregularity, only remains to be considered. It is not very important, at this time, to determine the meaning which is to be given to the thirteenth section of the declaration of rights, which provides that no person shall, for the same offence, be twice put in jeopardy of life or limb, as it is clear that such is the unquestionable doctrine of the common law; and we certainly have no statute which has introduced a different rule, as to the trials of that class of individuals, to which the prisoner belongs. It has been made a question, whether any of the provisions of the declaration of rights extends to slaves; therefore, it is desirable that this case shall be decided independent of the constitutional question, unless the same is necessarily involved.

Judge Story, in the case of the United States vs

Ned, a slave, *vs.* the State.

Gibert, et al, (2 Sumner, 19,) had occasion to examine a similar provision in the constitution of the United States, and found the authorities clear to sustain his view, that the privilege thus secured, is nothing more than a constitutional recognition of a very ancient and well established maxim of the common law. But notwithstanding the existence of this maxim, it has never, in England, been decided to extend further than the cases of acquittal and conviction.

In those cases, in which judgment has been arrested for any *defect* in the indictment, or if an acquittal has been had on an insufficient indictment—Staundford P. C. lib. 2,106—Lord Hale and Sergeant Hawkins recognizes the same doctrine, which is thus stated by the latter: " I take it to be settled at this day, that wherever the indictment or appeal, whereon a man is acquitted, is so far erroneous (either for want of substance in setting out the crime, or of authority in the judge before whom it was taken,) that no good judgment could have been given on it against the defendant,—the acquittal can be no bar of a subsequent indictment or appeal; because in judgment in law, the defendant was never in danger of his life from the first; for the law will presume, *prima facie,* that the judges would not have given a judgment which would have been liable to have been reversed. But if there be no error in the indictment or appeal, but only in the process, it seems agreed that the acquittal will be a good bar of a subsequent prosecution, notwithstanding such error; the best reason for which seems to be this, that such error has been solved by process"—2 Hawk. ch. 35, s. 8; 2 Hale's P. C. 181, 220, 249, 250.

Ned, a slave, *vs.* the State.

In accordance with this doctrine, this court refused to discharge a prisoner, on reversing the judgment of the Circuit court for an error committed in empanneling the jury ; though it was urged that this was extending the rule beyond any previous case—The State vs Coleman Williams, (3 Stew. 454.)

If by a reversal of the judgment, the prisoner could be placed in the same position which he occupied when the error was committed, we might say, in accordance with the adjudicated cases, that his life had never been at hazard ; but in the present case, we never can return the prisoner to that stage of the case, at which the error intervened.

We cannot judicially know how many jurors were convinced, that he was innocent of the crime charged; nor can we know, but that an acquittal might have been had, if the jury had not been retained.    On principle, then, it seems clear, that we cannot place the prisoner in a worse situation than he was, when the error was committed ; and as it is certain that some of the jurors were not convinced of his guilt, when they were discharged, and as this may never be the result of another trial, it follows, that the unwarranted discharge of the jury after evidence closed in a capital case, is equivalent to an acquittal.    Such was expressly admitted by Chief Justice Spencer, to be the effect of an unauthorised discharged—People vs Goodwin, (18 John. 187 ;) and was so declared in the Commonwealth vs Cook, (6 Serg. & Rawle, 577 ;) and the State vs Garriquez, (1 Hayw. 241.)

Such must have been the opinion also of the English judges, who sat in the case of the Kinlock's, (Foster, 17

Ned, a slave, *vs.* the State.

to 40,) as they entertained the motion in arrest of judgment, a matter which would not have been permitted, unless the position, if sustained, would have effected the discharge of the prisoners.

We may also claim the support of Judge Story, who has carried the rule so far as to deny the authority of a court to grant a new trial, in a capital case, at the request of the prisoner. Without yielding our acqu escence to this extension of the rule, we may say, it is clear, from his exposition of the cases, that an unauthorised discharge of a jury is equally fatal, to any subsequent trial, as an acquittal or conviction.

Our conclusion is, that the judgment of the Circuit court must be reversed, and the prisoner discharged.

[The writ of error in this case was applied for and awarded, at January term, 1838, but the final decision upon the merits, was not made until June term following.—Not being in possession of the opinion until January, 1839, the case has been, casually, inserted in an earlier part of this volume, than was strictly proper.]

THE REPORTER.