Denio, Ch. J.
When the case of the plaintiff in error came before us on a former -occasion, she had been convicted of *161 murder, upon a legal trial, and had been sentenced to be executed. This court then reversed the judgment because the legislature had subsequently enacted a statute which forbade the execution of such sentence as that which had been pronounced against her, and had required that such convict should be subjected to imprisonment at hard labor for one year, and, as we construed the legislative intention, should thereafter be executed if the Governor should issue his warrant for such execution. We considered this provision for imprisonment and death in the same case to be an ex post facto law, and held it to be void, because the Constitution of the United States had- prohibited the states from enacting such laws. It was considered to be ex post facto, because it attempted to change the punishment which the law had attached to the offence of the prisoner when it was committed, not by remitting some divisible portion of it, but by altering its kind and character. The principle of the judgment thus reversed has been since reaffirmed and applied in the case of Shepard v. The People (25 N. Y., 406).
Laying out of view for the moment the act relating to murder, passed in the year 1861, and considering this case as uninfluenced by this act, the inquiry is whether this convict can be again tried and convicted for the same murder. The legislature,, by declaring that persons under sentence of death when the act of 1860 was passed, instead of being executed according to their sentence, and according to the law as it had existed up to that time, should be put to hard labor for a considerable period, and afterwards hold their lives at the pleasure of the Executive, and be executed when, in his discretion, he should think proper so to order, did effectually repeal, as to that class of offenders, the prior law for the punishment of murder. As the punishment attempted to be substituted for that provided by the antecedent law, which had been abolished, could not be applied on account of the constitutional prohibition, it followed inevitably that the interference of the legislature had rendered it impossible that the prisoner should be punished under either law. It was not a sufficient answer to *162 the difficulty to say that the members of the legislature did not probably intend to grant impunity to offenders in the situation of the prisoner. They did intend to abrogate as to her and as to all persons in the same situation the former punishment, and that design they effectually carried out. They intended also that such offenders should be punished in another way, but this they could not effect on account of the constitutional inhibition. The reversal of the judgment against this prisoner, proceeding, as it did, upon the absence of any law for the punishment of her offence, as .effectually exempted her from being again tried and sentenced for the murder charged in the indictment, as it shielded her from the execution of the sentence already pronounced. If a new verdict of guilty should be returned on a second trial, it would . be impossible to render a judgment of death pursuant to the Revised Statutes, because the legislature had forbidden her to be punished in that way. It would be as true after such fresh trial and verdict, that she was a pérson who had been under sentence of death when the act of 1860 was passed, as it was when we reversed the former judgment, and the same reason which compelled us to reverse that judgment would preclude the giving of a similar judgment upon the second verdict, and would require the reversal of such second judgment if one should be rendered. It would be equally impossible to pronounce the compound judgment of imprisonment’ at hard labor and a subsequent execution as mentioned in the act of 1860, because the" constitutional objection to' that law would apply to her case after a second trial and a new conviction, in the same manner as when judgment was rendered upon the first conviction. It is, therefore, apparent to my mind that in reversing the judgment which had been rendered against the prisoner, we necessarily determined that the legislature had so interfered with the arrangements for the punishment of the crime of murder that a particular class of offenders, embracing the prisoner, could not be punished at all. It was the duty of the court of Oyer and Terminer to give effect to that, judgment in its disposition of the prisoner’s case, upon the *163 record being remitted to that court. The order which it made was in accordance with the law as it was here adjudged, unless the act of 1861 affects the case, and we think it was the only order which it could lawfully make.
There is a view of this case, which requires some further explanation. If it were true that the only part of the act of 1860 which was designed to reach the case of offences committed before that act was passed was the 10th section, which declares that persons then under sentence "of death, or awaiting sentence upon a conviction for murder, should be punished in a particular way, and if all the other provisions .of the act were prospective only, then, inasmuch as the substituted punishment could not be inflicted on account of the ex post facto character of the provision contained in that section, it might be argued that the section was void, and that it being the only provision abolishing the punishment provided by preexisting laws, the prisoner ought to have been left to suffer according to her sentence, which was pronounced under and in accordance with those laws. It is, therefore, a material inquiry, whether, by the true construction of the act, the former punishment was abolished generally and the new one substituted in respect to all offences of murder already committed. The act commences, in the first section, by declaring that no crime thereafter committed, except treason and murder in the first degree, shall be punished with death. The following sections, to the sixth, inclusive, are devoted to the new definition of murder in the first and in the second degree, and to the mode of punishing these offences, namely, by one year’s imprisonment at hard labor and then by a capital execution, if and when the Governor shall issue his warrant, as to the first, and by perpetual imprisonment at hard labor as to the second degree. If the act had stopped here, it ought, I think, to have been considered as wholly prospective, and it would have left the preexisting law to apply to offences committed prior to the passage of the ■act. But the seventh section, which immediately follows, is an alteration of the section of the Revised Statutes which denounced the penalty of death for treason, murder, and the *164 first degree of arson. It declares that it shall be amended so as to read as follows: “Every person who shall hereafter be convicted” of treason, murder, or arson in the first degree, “ as those crimes are respectively defined in this title, shall be punished as herein provided.” The words “ herein provided” must be construed to refer to the provision for punishment contained in the act, and not to the one mentioned in the Revised Statutes; though, if the section, as thus amended, kept its place in the title of the Revised Statutes to which it belongs, according to the system of amendments made in that form, the reference would be to those Statutes. But such a reading would leave all these offences without any punishment whatever, and certainly could not have been intended. Where new provisions, or modifications of existing provisions, are enacted by declaring that a particular section shall be amended so as to read in a given manner, in the form made use of in this case, the new part is to be construed, as regards the subject upon which it is to take effect, in the same manner that an independent statute, having the same provisions, ought to be construed. (Ely v. Holton, 15 N. Y., 595.) In interpreting this section upon that principle, the new punishment mentioned in it is attached to all future convictions, without regard to the time when the offence was committed. It is possible that such a verbal construction might, if there were nothing of a contrary tendency in the act, be forced to yield to the principle that a retrospective effect is not generally to be given to ah act of the legislature when it can be avoided. But this could only be accomplished by rejecting the natural meaning of the language. Passing over the seventh and eighth sections, as not material to the present question, we come to the tenth, which, as already mentioned, declares that all persons then (that is, at the time of the taking effect of the statute) under sentence of death, or convicted of murder, and awaiting sentence, shall be punished as if convicted of murder in the first degree under the act, that is, by both imprisonment and death. This renders it perfectly certain, as it seems to me, that the change of punishment was intended to apply to offences already *165 committed. Persons who had been convicted before the act was passed must, of course, have committed the offences of which they were convicted prior to that time. There might be a good reason for suffering offenders, who had been condemned in the course of criminal proceedings, to receive the punishment which the law had annexed to their offences, though it might, at the same time, be judged proper to change the punishment of those who had not yet been prosecuted; but there can be no conceivable motive for inverting the position, by suffering the old law to remain as to offenders who were yet to be tried, while such as had received judgment under the former law should have their sentences changed by legislative enactment. The reason for a change of punishment in regard to actual convicts would apply with greater force to offenders who had not yet been prosecuted. The intention of the legislature seems to me very plain. The amendment of section one of the fourth part of the Revised Statutes prescribed the new punishment for all future convictions; and as it was not intended that the old punishment should ever be thereafter resorted to, the case of persons who had been actually sentenced or convicted, and who were awaiting sentence, was taken up, and their punishment changed by the unusual expedient of a legislative revision, so as to conform them to the altered rule which had been established respecting future convictions, and for all other cases. The last section of the act furnishes additional evidence to the same effect. It repeals, by their numbers, twelve sections of the Revised Statutes. The repeal is absolute, direct and immediate. Those sections, it is said, “ are hereby repealed.” On looking at these repealed sections, it will be seen that they contained provisions inconsistent with the new mode of punishment, though well suited to the former method. Section 12 required the execution to take place at a time not more remote than eight weeks from the time of the sentence, which, of course, would not admit of the year’s intermediate imprisonment. Section 13 required the judge who presided at the trial immediately to send to the Governor a statement of the conviction and sentence, with his *166 notes of the testimony. There was no other apparent motive for this repeal' except that it was reenacted in the same language-in the new statute. The repeal of the fourteenth section, which empowered the Governor to require the opinion of certain judicial officers upon the statement, proceeded upon some motive not apparent to me. The sixteenth, seventeenth, eighteenth and nineteenth sections of the Revised Statutes provided for the case of convicts alleged to have become insane after being sentenced to death. A summary inquiry to determine the fact of insanity was to be instituted, before a jury, and if the convict was thereby found to be insane, the execution was to be suspended until the sheriff should receive a warrant from the Governor or from the justices of the Supreme*Court, directing the execution. The inquiry as to the existence of insanity would be pertinent under either system of punishment; but to the arrangement which required a preliminary imprisonment of one year, and then the Governor’s determination that’ execution should take place, the provision which gave the judges authority to issue the warrant would be hostile. The sixteenth and seventeenth sections were therefore allowed to stand, and the eighteenth was amended, by the eighth section of the act of 1860, by repealing the part allowing the judges to issue the warrant. The section was changed in another particular, not material to the present question. By tile nineteenth section, the Governor was authorized, as soon as he should be convinced of the sanity of the convict, to appoint a time and place for his execution. As this might interfere with the direction for the year’s preliminary imprisonment at hard labor, the section was embraced among those • which were repealed. Three of.the repealed sections—the twentieth to the twenty-second, inclusive—make certain provisions for the case of a female sentenced to death and discovered to be pregnant. An inquiry into the facts is directed, and the execution is suspended until the impediment shall have ceased to operate, when the Governor is .authorized to fix a day for it to take place. This would all be unnecessary and inapplicable where a year’s imprisonment is required to intervene between the *167 sentence and the capital infliction. A similar motive existed for repealing sections twenty-th^ee and twenty-four, because, under their provisions, a capital execution' might take place within one year from the time of the sentence. They required the Supreme Court to appoint a time for the execution of a capital sentence when the time fixed by the sentence itself had, for any reason, passed by, and to issue their warrant to the sheriff for that purpose. This would take from the Governor the discretion which the new mode was intended to vest in him, and might require the execution to take place within the year. The reason for the repeal of section twenty-five, which declared that the punishment of death should be by hanging, it is more difficult to understand. As it seems clear that it was designed by the authors of the statute that capital punishment should in some cases be inflicted, I am inclined to suppose that the repeal of this provision was inadvertent. It is not, how-? . ever, necessary to solve that doubt. The actual and immediate repeal of the section is certain, and the consequence is the same, whatever may have been the motives which led to it. One of the sections of the Revised Statutes stated to be repealed by the last section of the act of 1860 is section-twenty-nine. .There is no. such section in that title—the section numbers ending at section twenty-seven;"but the substance of an act of 1846 (ch. 118) is incorporated into some of the late editions of the Revised Statutes, and is there numbered twenty-nine, and it is this provision which is attempted to be repealed. (R. S., 5th ed., vol. 3, p. 938.) It provides for the case of a. prisoner under sentence of death being confined in a jail in another county from that in which he was convicted, in consequence of the proper jail being unsafe, &c.; and the direction is that the sheriff of the county in which he is actually confined shall, “ on the day appointed for the execution of the sentence,” perform that duty. It was seen that this enactment, if literally followed, would compel an execution without allowing a space for the year’s imprisonment, and hence it was repealed. I have been thus particular to state the effect of this repealing section, which took, effect immediately upon the passage of the act of *168 which it is a part, in order to show the persistent determination of the legislature that no capital execution" under the former laws should thereafter take place, and to establish that there is no ground for saying that the change of punishment was intended to be prospective merely, or that there was an implied saving in the statute in respect to offences theretofore committed. ' The plain direction by which the new rule is applied to all future convictions; the express provision made to embrace the case of offenders already convicted and sentenced, and the present repeal and amendment of all those portions of the Revised Statutes which would conflict with the immediate operation of the new mode of punishment, demonstrate, I think, the design of the legislature to apply that mode to all future executions of sentences of death whenever the offence was committed and whenever the conviction took place.
I have not overlooked the rule of interpretation by which general language in a statute is required to be construed prospectively, and not retrospectively, unless a contrary intention plainly appears. A somewhat strained construction is allowed in such cases, when necessary to prevent injustice or public inconvenience, and in furtherance of a presumed general intention of the legislature. But the section of this statute by which offenders, who had been actually tried, convicted and sentenced when it was passed, are expressly subjected to the new punishment, forbids any such forced construction in the present case. We know, with absolute certainty, that it was designed by the authors of the law to apply the new punishment to the case of offenders who had been already convicted under the antecedent law; and we cannot, therefore, refuse to give effect to the language by which they, in terms, subject all future convicts to such new penalty, upon any suggestion that they did not intend what their language naturally imports. The effect of the provisions of this statute, therefore, is to forbid, from the time of its passage, the infliction of the penalty of death, simply and unconnected with any other punishment, in any case, and to substitute for such penalty the year’s imprisonment, and then the putting to death of the offender in *169 some form, if the Governor shall so determine. The- substitute may have the full effect intended as to future offences, but can have no operation in respect to those already committed, for the reason which has been mentioned. But the preexisting law having been displaced by a repeal, to make room for the substituted system, it cannot be resorted to for any purpose, though such substituted system, in one aspect of it, cannot be applied.
Some portions of the opinion prepared by Mr. Justice Sutherland, in Shepherd v. The People (25 N. Y., 406), may be considered hostile to a portion of the reasons given for the judgment in Hartung v. The People, as reported in the 22d volume of New York Reports, and which I have now more fully explained; but so far as that opinion conflicted with those reasons, it was unnecessary to the determination of the case, and was not concurred in by a sufficient number of the judges to pronounce a judgment.
udgmenthe case of the plaintiff in error. If it could apply to the persons in the situation in which she was when the act of 1860 repealed the penalty to which she was subject by the antecedent law, it must be by retracting the repealing clauses and reinstating such antecedent law and directing its application to her case, and to the cases of all other persons similarly sitúated. But while the repeal remained unaffected by any subsequent law, the process against the plaintiff in error came before this court in the regular course of justice, and the question was presented whether the conviction and judgment which had been pronounced respecting her should be affirmed and executed, or should be reversed and annulled as unwarranted by the then existing law; and the judgment was that it should be reversed and annulled. No question can now be made as to the legal propriety of that determination. It is res adjudieata between the people of the state and the plaintiff in error. Now acts done and closed pursuant to a law which15, is subsequently repealed, must endure and stand and be good and effectual notwithstanding such repeal. (Dwarr. on Statutes, *170 534.) This was the case as to the alleged offence of the plaintiff in error! When the process against her was presented for final adjudication in this court, and it was found that there was no law authorizing the punishment of her imputed offence, a judgmént was pronounced in her favor which absolved her from being again legally questioned for that offence. It was equivalent to an acquittal upon that charge, for it was the judgment of a court of competent jurisdiction that in the then state of the law she could not be subjected to punishment. The effect of the repealing act of 1860 was to expunge the prior law from the statute book as completely as though it had never existed. If the legislature was competent to change this state of the law, by a repeal of the repealing act, and thus to blot out such first repealing act so that it could not thereafter be availed of, which it is not necessary to deny, still it could not, in my judgment, destroy the effect of a judgment pronounced in the meantimeand while the first repealing act was in force. Suppose a person had been prosecuted after the passage of the act of 1860, and before its repeal by the act of 1861, for an alleged murder committed before the passage of such first mentioned act, and had been acquitted, not for want of proof of the corpus delicti, but upon the grounds on which we proceeded when this case was before us for the first time, namely, that the act of 1860 had repealed the provisions of the Revised Statutes for the punishment of murder. Ho one, I suppose, could maintain that such a person could be again prosecuted for the same offence -after the enactment of the statute of 186Í. Such prosecution, in my judgment, would be liable to be defeated by two conclusive objections; first, that the act of 1861 as applied to such a case would be an ex post facto law and unconstitutional. By the repeal of the provisions of the Revised Statutes and the trial and acquittal óf the offender while such repealing law was in force, the act of the prisoner, though not innocent in a moral sense, would be dispunishable. A legislative act restoring the repealed law would have precisely the same effect as though the offence had not been punishable originally, but had been made so for the *171 first time by the restoring act. Such a law would be within the spirit of this constitutional prohibition and would, in my opinion, be void. The other objection referred to would arise under the constitutional injunction that no person shall be twice put in jeopardy for the same offence. The general rule, as is well known, is that if a person has been once tried and acquitted or convicted, he may plead such prior acquittal or conviction upon a subsequent arraignment for the same offence. These would be good pleas at the common law, and the constitution only affirms the principle and renders it unalterable by any exertion of the law-making power. But it does not apply where the indictment was defective, so that no lawful judgment could be rendered upon it, or in the case of a mistrial, as where there was no venire, or where the trial jury did not'consist of the full number of twelve jurors, or where a new trial has been ordered on account of erroneous ruling upon the first trial, or in cases of the like nature, nor where-the jury was discharged from necessity without rendering a verdict. In this class of cases it may be said that the accused was never in legal jeopardy. But where neither the indictment nor the trial were subject to any legal exception, but the conviction or judgment has failed of its natural effect by the interposition of the government or of the prosecution, it would be contrary to the spirit and intention of the rule and of the constitutional provision in affirmance of it, .if the accused could be subjected to another trial for the same offence; and, moreover, as it seems to me, it would be manifestly unjust* and oppressive. If the legislature can authorize a second trial where there has been a conviction which has become ineffectual by its own interposition, it may do so where there has been an acquittal. The two cases fall within the same reason. I not considered it necessary to refer to the numerous cases where the rule and its exceptions have been the subject of judicial exposition, because the most material of them have been very carefully examined in the opinion in the before mentioned case of Shepard v. The People. That case itself is a precedent for the judgment I am about to recommend in the *172 present instance. The offence of Shepard, which was arson in the first degree, was committed prior to 1860; and his trial upon which he was convicted, took place in the early part of 1861, and before the enactment of the act of that year. He was Sentenced to perpetual imprisonment, in intended obedience to that act. The Revised Statutes in force when the act of which he was accused was perpetrated, did not,.as we held, warrant that mode of punishment, and the act of 1860 was held to be void in its application to that case as being an ex post facto law. We were of course bound to reverse the judgment of the Oyer and Terminer which had been affirmed by the Supreme' Court, a'nd the question then arose whether it was proper to award a new trial or whether the accused should be discharged. This involved the consideration of the effect of-a trial and verdict perfectly legal and regular upon an indictment in all respects sufficient, and when the only error "'consisted in pronouncing a judgment which was not warranted by any law. It was determined that the prisoner had been once placed in jeopardy in the sense of the constitutional provision, and we added to the reversal of the judgment an order that he should be discharged. The question did not arise whether he could have been sentenced under the provisions of the Revised Statutes as no such sentence had been given. The point adjusted was the same which is now presented. In neither case was'there any defect nor error in the indictment, trial or verdict. In the case of Shepard the judgment was illegal; in that of the present plaintiff in error the judgment had become illegal by the repeal of the law by which it was once authorized; but we held in the case of Shepard that the former construction precluded the possibility of another trial, and on that ground we made the order for the discharge of the prisoner. The principle thus settled shows that the "judgment of the Oyer and Terminer in the present case was correct. '
I have intentionally omitted in what has thus far been said, to. make any reference to the order which was entered for a new trial when the' judgment against the plaintiff in *173 error was reversed. If the effect of the judgment of reversal under the circumstances and for the reasons upon which it proceeded, was such as to render another conviction impossible, the order so entered would not deprive her of the bene-' fit of that judgment. It did not in terms direct a new trial upon the issue of not guilty of the murder of which she stood charged; and taken in connection with the reasons which were given on the judgment of reversal, it could not well have been so understood; for we held that whether guilty or not, the legislative interposition, and the constitutional prohibition against changing the punishment which existing laws had attached to an offence already committed, prevented any sentence against her. Besides, her guilt of the act charged had been established by an unexceptionable trial and verdict. If she had been punishable under the Revised Statutes notwithstanding the act of 1860, the judgment was correct as it stood, and there was no reason for reversing it. If the provision substituting a different punishment had been constitutionally valid, there was still no reason for reversing the judgment, for the governor and the sheriff could have executed the will of the legislature; and it was the design of the act that it should be executed by these officers, in the case of a conviction and sentence which remained unexecuted when the act of 1860 passed without any further resort to the courts. The judgment of reversal, even independently of the reasons given, necessarily affirmed that she could not be punished under either of these legal provisions, and as there were no other modes of punishment, it followed that she could not be punished in any way. The formal order for a new trial, if it meant a new trial for the murder upon the issue which had been once tried and determined, would have been plainly inconsistent with the judgment of reversal, as well as with the reasons upon which it proceeded. If it had been understood as a mandate to the Oyer and Terminer to proceed with the case. in accordance with the principles established by the judgment of reversal, the discharge of the prisoner might have been ordered by that court without a further trial, the facts invol *174 ved being continued in the record. Enough appears in.the case as now presented to show that the award of a new trial was improvidently entered, and the whole ■ case being legitim ately before us on this writ of error, we are bound to give effect to the law as it has been pronounced, and we accordingly reverse the judgment of the Supreme Court and affirm that of the Court of Oyer and Terminer, and direct the prisoner to be discharged.
Davies, Weight, Selden and Marvin, Js., concurred.
Emott, J.
It is too late, in my opinion, to inquire whether' this court pronounced a correct judgment in directing a new trial upon the former writ pf error. The People and the prisoner acquiesced in and pursued that judgment, and the new trial which it ordered has been had. It was not'necessary that the trial should be upon a plea of not guilty, involving the merits of the indictment. The prisoner was allowed, in the Court of Oyer and Terminer, by an exercise of discretion which we cannot review, to withdraw her plea of not guilty, and plead three special pleas in bar. To these the district attorney replied specially. . The prisoner demurred to the replications, and the People joined in demurrer, and the issue of law thus made was tried in the court in which the indictment was pending. This was a new trial of the prisoner in conformity with the order of the Court of Appeals, and whether that order was correctly or inadvertently made, cannot now be considered. We are only concerned with the result of the trial which has been had under it.
. The two first pleas of the prisoner are in substance the same. The provision of the Constitution of the United States, that no person shall be twice put in jeopardy of life or limb for the same offence, is an explicit and solemn recognition of the maxim of the common law that no man shall be twice tried for the 'same offence; and the test by which the courts determine whether a person has been once in jeopardy, or once already tried, is whether a plea of autrefois acquit or autrefois convict can be sustained, according to the rules of the common law. *175 (People v. Goodwin, 18 John., 187; Story on the Constitution, § 1787.)
Great learning and ability were displayed on both sides in the argument at the bar, whether,- to sustain a plea of autrefois convict, there must be a judgment as well as a verdict. There is, it must be allowed, at least a seeming inconsistency in the language of the authorities upon the question. Mr. Justice Blackstone (4 Comm., 336), says that the plea of a former conviction for the same identical crime, though no judgment was ever given or perhaps ever will be (being suspended by the benefit of clergy or for other causes), is a good plea in bar to an indictment. On the other hand, Sir Matthew Hale (Pl. Cor., 248), cites Faux's case (4 Co. R., 45), as holding that autrefois convict by verdict is no plea, unless judgment be given upon the conviction. In the opinion of Chief Justice Spencer, in the case of The People v. Goodwin (supra), he says, speaking of a plea of a former acquittal, that, to render it a bar, there must have been a legal acquittal by judgment upon a trial for the same offence and the verdict of a petit jury. Chitty, in his Criminal Law (vol. 1, p. 462), speaks somewhat less distinctly of a sentence or judgment being requisite. He says, •“ the crime must be the same for which the defendant was before convicted, and the conviction must have been lawful, on a sufficient indictment; and if he has neither received sentence nor prayed the benefit of clergy, this plea is said not to be pleadable if the former indictment were invalid.” There would seem to be a practical injustice, and an inconsistency with the meaning and spirit of the common law rule, as adopted by the constitutional provision in this country, in demanding that a prisoner should have received sentence in all cases before he should be allowed to plead that he had been once convicted, or had been once in jeopardy for the same offence. It might be in the power of. the court before whom the first trial was had arbitrarily to suspend sentence. I am not aware of any power or right on the part of a prisoner to ask for judgment against him in-such a case. Yet he might thus be deprived of the protection of a previous valid conviction noon a second trial for the same offence, and *176 possibly exposed after the termination of his sentence upon the second trial, to be arrested, sentenced and confined upon the first conviction.
The plea of autrefois convict must certainly be proved in part by a record. Lord TTat/ei says the plea “ consists of two kinds of matters: 1st, matter of record, namely, the former indictment and acquittal or conviction, and before what justices and in what manner; 2d, matter of fact, viz., that the prisoner is the same person, and the fact is the same.” So Mr. Chitty says the plea must set forth the former record and aver the identity of the person and the offence. (1 Chit. Crim. Law, 463.) The rule, however, is mainly a rule of proof, and questions upon the character and sufficiency of the first conviction have arisen upon the record introduced. In Rex v. Parry (7 C. & P., 836), the original indictment and minutes of the clerk of assize were received to prove an acquittal at the same sitting, upon the authority, as the presiding judge stated, of Horne Tooke’s case (25 St. Tr.), in which similar evidence had been received of a conviction of other persons than the prisoner. In Rex v. Bowman (6 C. & P., 101-337), when the conviction had been had at a former session, the proceedings were adjourned for several sessions, to enable the prisoner upon a second trial to take proceedings to compel the magistrates to make up a record.
It is, however, the result of all the English adjudged cases and the better construction of the authorities, that if judgment is stayed or suspended without affecting the conviction, as by the convict praying and obtaining benefit of clergy, this will not prevent the conviction being a bar to a second trial. And there is no doubt that if sentence upon the first conviction should be delayed or suspended for any cause other than error in the trial or insufficiency in the indictment, and the convict remained at all times exposed to its infliction, the conviction before judgment would sustain the plea of autrefois convict. In the case at bar the prisoner has indeed been decided not to be liable to the infliction of any sentence, but not for any cause connected with either the trial or the judgment, but by *177 an. obstacle created by legislative action solely. As to the proof in such a case, equally as when judgment had been pronounced, the conviction must be proved by the records of the court in which it was had, but there cannot, of course, be a record of judgment containing a sentence.
I confess, however, that this question does not assume to' my mind the same importance in the present case, which was attached to it upon the argument. The pleas of the prisoner allege a trial, conviction and sentence, upon the same indictment to which she was now put to plead. They do not plead a judgment in terms, but they allege all the necessary and component proceedings and parts of a judgment. The replications, however, supply the defect if it be one, admitting and averring a judgment as well as a trial, conviction and sentence, in order to ave'r that such judgment and conviction have been reversed. The allegation in the replication is that the conviction, sentence, proceedings and judgment of the Oyer and Terminer, were reversed and annulled in .the manner and for the cause specified. The demurrer of the prisoner admits this allegation of fact, and it therefore is a part of the record before us that the conviction as well as the judgment has been reversed, and if the character of that reversal is not such as to leave to the prisoner the benefit of the judgment upon the present pleas, it must have the same-consequences as to the conviction. A reversal of the judgment for - error in the proceedings, would necessarily import and involve the reversal of the conviction. So if this court had discharged the prisoner instead of ordering a new trial upon reversing the judgment for the causes stated in the opinion delivered on the former writ of error, the conviction must certainly have fallen with the judgment. It could 'not have been said to remain in force for any purpose, or to have any consequences against the prisoner, after the reversal of the judgment upon it.
■ The question presented by these demurrers upon the present branch of the case, in my opinion is, whether such a reversal of the judgment and conviction as is pleaded in the replica *178 tions, prevents that conviction from being a bar to a subsequent trial. I do not, in this aspect of the case, any more than in the preliminary part of it, attach importance to the fact that a new trial was ordered by this court. The report of the case which is incorporated in and pleaded as part of "the reply, states that a new trial was ordered because the court could not see judicially that the prisoner could not be convicted of manslaughter in this indictment. Whether this was so or not would not seem to have been carefully considered by the court, and the question would probably be reconsidered if it should become necessary. But as the record is now presented there is no plea of not guilty, and the prisoner confesses the crime of murder and avoids it by the special matter which she pleads. Both parties admit upon the record that the prisoner if convicted at all must be convicted of the offence of which she is indicted, and the single question presented by the demurrer is, whether the reversal of her previous conviction and sentence pleaded in the replication destroys the bar of such former conviction.
The law is laid down by the authorities that a former conviction to bar a second trial must be upon a sufficient indictment, and before a competent court. (2 Hawk. Pl. Cr., ch. 35, § 8; 2 Hale, Pl. Cor., 248.) In the case of The People v. Barrett (1 J. R., 66), the Supreme Court held that they would look into the first indictment and ascertain whether it would have sustained a conviction, and Chief Justice Kent said that if the first indictment was defective so that no good judgment could be given upon it, an acquittal upon such indictment would be no bar. In a case where judgment had been arrested on account of the insufficiency of the indictment, or where’it had been reversed for error at the trial, it is open to no question that the prisoner might be tried again. And upon a reversal of a judgment rendered on the conviction of a prisoner, it would be a necessary presumption, nothing appearing to the contrary that the reversal was for error either in the indictment or at the trial, and in such case of course such conviction and judgment would no longer be in the way of a second trial. So in- *179 The People v. Casborus (13 J. R, 351), a plea of a former judgment in bar was overruled, on it appearing that the court which gave it had arrested judgment. But in the case at bar the record brings before us the fact that although the former conviction and judgment against the prisoner have been reversed, yet that such reversal was not' for insufficiency in the indictment, nor for error at the trial, but for matter subsequent and dehors both the conviction and the judgment. The Court of Appeals expressly held, and the people and the prisoner both admit by these pleadings that the conviction of the .prisoner, and thé sentence and judgment which followed thereon, were valid and free from error when they were had and pronounced. The judgment of this court was simply that this judgment of the Supreme Court and the Court of Oyer and Terminer ought not to be executed. The court do indeed say that they reverse that judgment for error in the record. But this does not mean that the record discloses any error in itself, but that the judgment was found to be erroneous by applying to it the law as it then stood. In other words, it is reversed just as it would be arrested by the court which gave it, on the ground that its execution had by subsequent matter become unlawful o.r impossible. If the first judgment had been arrested for such a cause by the Court of Oyer and Terminer, as Judge Dentó intimates might have been done, and as was done in the English cases referred to in his opinion, no one could have said that such a judgment upon a valid trial and sentence would not have been a bar to a second trial, notwithstanding its execution was arrested. So in England when after judgment the offender prays his benefit of clergy and goes without sentence. In such cases the arrest, or suspension, or reversal, appears on the record to have been for causes which did not affect the conviction. The reversal in this court of the former judgment in this case is strongly analogous to the result of praying benefit of clergy in England in its consequences. The fact remains, notwithstanding it, that this prisoner has been tried, convicted and sentenced without error in the process, indictment, pleading and trial. As this appears from the *180 record itself, I have no hesitation in saying that the replications were no answer to the pleas, and that the judgment of the Oyer and Terminer upon the demurrer to the first two replications was right.
It may be proper to add, that this opinion was prepared, and these views expressed, without the writer having been informed precisely of the reasoning by which the court reached its conclusions in the case of Shepherd v. The People. I have not been furnished with any copy of the opinion in that case, and it may be that what has now been said is merely a repetition of what has been already adjudged in that court. If so, the present decision may be placed more securely on the authority of that case. This woman by the record before us confesses herself guilty of murder. She has been duly and legally indicted, tried and convicted of the crime by a competent court, and there was neither insufficiency in the indictment nor error at the trial. If she has not suffered any punishment, and is not exposed to the infliction of any, it is due, not to anything done or omitted by the court or the jury which tried her, but to action on the part of the legislature so unexampled, as to leave the courts without a precedent by which to measure its consequences. She has once-been in legal jeopardy of her life, and there is no power in the courts under the rule of the common law, and the injunction of the Constitution to compel her to stand in the like peril a second time. If it should be done in the present case to prevent a criminal from escaping altogether from punishment, a similar departure from the time-honored maxim of the law might in the next case visit the innocent and fairly acquitted with infamy, or redouble the penalty which the law inflicts upon offenders. There is no rule of public justice which commends itself more manifestly to conscience than that which forbids a man to be twice vexed for the same offence, and makes the result of a fair and lawful trial, be it conviction or acquittal, binding alike upon the accuser and the accused. As we have found no technical difficulty in the way of the application of that rule to this case, we are bound to declare that the con-. *181 viction of the prisoner standing upon the record unimpeached in law or in fact, and only arrested by subsequent action of legislative power, is a bar to any subsequent trial for the same offence.
Having reached this conclusion, it is unnecessary for me to determine the effect of the repeal of the statute of 1860, and the passage of that of 1861, as set up in the third plea and replication, and I shall not enter upon the consideration of that question.
The judgment of the Supreme Court should be reversed and that of the Oyer and Terminer affirmed, and the prisoner discharged.
Balcom, J.
The prisoner was legally and properly convicted of the crime of murder in the Albany Oyer and Terminer, and sentenced by that court to be executed at a specified time, within eight weeks from the time of her sentence, without the intervention of any irregularity or error. But by reason of the passage of chapter 410 of the Laws of 1860, this court reversed her conviction and granted her a new trial. (22 N. Y., 95.) On her retrial she pleaded her first trial and her conviction then had in bar of her further prosecution for the same offence. I am of the opinion such plea was valid. She is protected from further prosecution for the same offence, by the Constitution of this State and of the United States; The former declares that no person shall be subject twice to be put in jeopardy for the same offence. (Con., Art. 1, § 6.) The latter, “ nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb.” (Art. 5, Am’d, Con. U. S.) For these reasons I shall vote to reverse the judgment of the Supreme Court and affirm that of the Oyer and Terminer, and for the unconditional discharge of the prisoner.
All the judges concurring,
Judgment ordered accordingly.